The State v. H. E. Taylor, Appellant.—73 S. W. (2d) 378.

Court en Banc, June 15, 1934.

*Randolph & Randolph* for appellant.

*Roy McKittrick*, Attorney-General, and *Wm. Orr Sawyers*, Assistant Attorney-General, for respondent.

FITZSIMMONS, C.—Defendant was found guilty of issuing a check in payment of a past-due debt, he knowing at the time that he did not have sufficient funds in or credit with the bank upon which the check was drawn for the payment of the check. His punishment was a fine of $200. The offense charged is a misdemeanor under Section 4305, Revised Statutes 1929 (4 Mo. Stat. Ann., p. 2998). Defendant by motions to quash the information and for a new trial and by other timely objections, put into the case the question whether Sections 4305 and 4306 are in violation of Section 16, Article II of our State Constitution which forbids imprisonment for debt. The presence of this question caused the appeal to be allowed to this court. The charge was laid in Daviess County. The case was tried in the Circuit Court of Caldwell County on change of venue. Defendant perfected his appeal, save that he did not file a brief in this court. In these circumstances we look to the motion for a new trial for assignments of error. [State v. Ellis, 290 Mo. 219, 234 S. W. 845.] The evidence offered by the State shows the following facts:

In the summer of 1930, the prosecuting witness, Fred E. Cooper, was a blacksmith and farm machinery salesman at Mabel in Daviess County. Defendant, Harold E. Taylor, was a farmer and resided about six miles northeast of Mabel, in DeKalb County. Taylor had one or more running accounts with Cooper. On one account Taylor alone was liable. The other account was in the name of Taylor and his mother. On or about June 26, 1930, Taylor and his wife entered Cooper's place of business at Mabel. Defendant Taylor wanted to buy twine as he was cutting grain. Cooper said he could not give Taylor any more credit until he made a payment on his account. The books were examined and Taylor was found to owe Cooper about $225. The parties then made an arrangement which was in accordance with a proposal of Taylor. By this arrangement Cooper sold Taylor 400 pounds of twine at thirteen cents per pound, amounting to $54. Taylor and his wife executed and delivered to Cooper their promissory note for the whole account including the twine. Taylor also executed and delivered to Cooper a check for $163.50 which he drew upon his account in the Winston Bank at Winston, in Daviess County. This check was to be in payment of the price of the twine and of half the old account. Taylor postdated the check July 20, 1930. The last named date was a Sunday. On the following day, July 21st, Cooper presented the check at the Winston Bank for payment. The assistant cashier refused to honor the check for the reason that there were insufficient funds in Taylor's account. Cooper then drove to a field where Taylor was threshing wheat and

informed Taylor of the nonpayment of the check. Taylor stated that Cooper should have presented the check to the cashier, with whom, Taylor said, he had a credit arrangement. Taylor then changed the date of the original check from July 20th to July 22nd, the next day, and gave it back to Cooper with a direction to present it to Mr. Black, the cashier, rather than to Mr. Manring, the assistant cashier of the Winston Bank. Instead, Cooper deposited the check on July 24, in a bank at Cameron, Missouri, in which he had an account. The check was returned unpaid to the bank at Cameron on July 29. Cooper demanded payment of the check on the same day, July 29. But Taylor did not at any time make the check good. Mr. Black, cashier of the Winston Bank, a State witness, testified that Taylor did not have a credit arrangement with him to pay the Cooper check for $163.50 in any event. On July 26th, Taylor had on deposit $4. On July 27th, he made a deposit of $135. On that day there came to the Winston Bank checks of Taylor for $116, $4, and the Cooper check for $163.50. Black visited Taylor and inquired of him which of those checks the bank should pay, since the amount to Taylor's credit was not equal to the sum of all the checks. Taylor directed Black to be sure to pay the checks for $116, and $4, but that he, Taylor did not care about the Cooper check. Accordingly Black marked the Cooper check unpaid on account of insufficient funds and, on July 27, sent it back to the bank at Cameron through the channels by which it had come. Black also testified that if he had not been instructed by Taylor to pay the two smaller checks, he would have paid the Cooper check on July 27th. Although that would have left an overdraft of about $30. Black knew that Taylor had more money coming in, and in fact he made substantial deposits within a few days after the return of the check. Taylor did not testify. Mrs. Taylor and other witnesses on behalf of defendant gave testimony tending to discredit the statement of Cooper that Taylor changed the date of the check to July 22nd, when Cooper visited him in the field on July 21st. In other essentials the State's case was not discredited. The check set out in the information and offered in evidence was dated July 22, 1930. Other facts will be stated if necessary in the examination of assignments of error.

I. Defendant contends that the provisions of Section 4305, Revised Statutes 1929 (4 Mo. Ann. Stat., p. 2998) making it a criminal offense to make, draw or deliver a check for the payment of a past-due account when the maker of the check has not sufficient funds in the bank for the payment of same, violates Section 16 of Article II of the Constitution of the State of Missouri, because the provisions of the statute in effect impose a criminal offense upon a defendant who fails to meet a purely simple obligation for a debt and therefore authorizes imprisonment for a debt in violation of the

Constitution. The same objection was raised by the motion to quash. A like attack was made both in the motion to quash and the motion for a new trial on Section 4306, Revised Statutes 1929 (4 Mo. Ann. Stat., p. 2999), which provides that the making, drawing, uttering or delivering of a check, draft or order, payment of which is refused by the drawee, shall be prima facie evidence of intent to defraud and of knowledge of insufficient funds in or credit with the bank, provided that the maker or drawer shall not have paid the drawee thereof the amount due thereon within five days after receiving notice that the check, draft or order has not been paid by the drawee.

Section 16, Article II of the Constitution is as follows: "That imprisonment for debt shall not be allowed, except for the non-payment of fines and penalties imposed for violation of law."

In our opinion Section 4305 and 4306, Revised Statutes 1929, do not impose imprisonment for debt in violation of the Constitution. In the instant case, by the verdict of the jury, a fine was assessed against the defendant, and, by the judgment of the court predicated upon the verdict, he was ordered committed to the custody of the sheriff pending the payment of the fine. The State also was awarded execution. The debt created by the verdict and judgment falls within the exception to Section 16, Article II, for it is a fine for violation of law. As for the debt due upon open account from the defendant to Cooper, it is a thing wholly apart from the cause of defendant's liability to imprisonment. It is true that Cooper could bring a civil action against defendant either upon the open account or upon the dishonored check. But it is also true that well-nigh every criminal act, whether it be a felony or a misdemeanor, creates a civil liability of the wrongdoer to the wronged person. Yet this fact does not change or destroy the criminal nature of the overt act, or free the wrongdoer from the penalties imposed however harsh they may be.

The part which checks play in the daily business, both large and small, of the American people, is such that any misconduct with respect to them calls for the just exercise by the State of its police power in the form of statutory penalties. This court so held in ruling that a statute imposing a penalty for maliciously throwing down fences was not a form of imprisonment for debt. [Blewett v. Smith, 74 Mo. 404.] The foregoing case was an action for false imprisonment. Defendant Smith proceeded against plaintiff Blewett before a justice of the peace under a trespass statute. There was judgment and an award of execution in favor of Smith and against Blewett, and subsequently an imprisonment of Blewett for failure to pay the judgment. The action for damages for false imprisonment followed. This court reversed the judgment below which was rendered upon the theory that the trespass statute allowed imprisonment for debt. An observation of this court in that case is very pertinent here (74 Mo. l. c. 409):

"There can be no question, if the proceeding against plaintiff had been by indictment to recover the penalties authorized by the act, instead of a civil proceeding by the party injured, that he would have been liable to imprisonment for the nonpayment of any judgment which might have been rendered against him." So, too, in the instant case, the defendant, who was proceeded against by information, should be liable to imprisonment for the nonpayment of the judgment of fine against him, without benefit of the constitutional protection which he seeks.

In the Blewett case too, this court, in upholding the trespass statute against the same constitutional defense which is made here, noted (74 Mo. l. c. 409) that the statute "was designed to protect the enclosed premises of all persons, whether farmers, mechanics, merchants or others, from the invasions, destruction and damage to which they would be subjected by such 'trespasses as throwing down the fences enclosing them, often committed by lawless, reckless and irresponsible persons." With equal force we may say that the statute which we are examining is designed to protect all persons whether farmers, mechanics, merchants or others, against the evil effects of the utterance of checks upon banks in which the drawers have not sufficient funds. It is a modern nuisance, "often committed by lawless, reckless and irresponsible persons." It disarranges and retards the business affairs of every person and institution through whose hands such a check passes to the bank upon which it is drawn, and from which it returns by the same route to the person to whom it was delivered by the drawer. And this nuisance is so common, insufferable and injurious as to cause the State to resort to "the just exercise of its police power," as was said in the Blewett case, supra.

An examination of the cases shows that the protection of Section 16, Article II, of the Constitution and of a like provision in the Constitution of 1865 was limited to proceedings for the mere payment of money as for a debt.

In Coughlin v. Ehlert, 39 Mo. 285, this court held that an order for the payment of alimony was merely an order for the payment of money, and that the man who refused to pay could not be imprisoned for contempt of court, imprisonment for debt having been abolished by the Constitution of 1865. But the court qualified its ruling by saying (39 Mo. l. c. 286): "We do not mean to say that a party may not be put in contempt for disobeying a decree for the performance of acts which are within his power and which the court may properly order to be done. If it were shown, for instance, that the party had in his possession a certain specific sum of money, or other things, which he refused to deliver up under the order of the court for any purpose, it may very well be that his disobedience would be a contempt for which he might lawfully be imprisoned. But the order must be for the performance of some specific act other

than the mere payment of money.'' Upon the authority of the Coughlin case the St. Louis Court of Appeals made a like ruling in In re Floyd Kinsolving, 135 Mo. App. 631, 116 S. W. 1068. The petitioner, Kinsolving, was ordered discharged from jail to which he had been committed for failure to comply with a judgment for alimony.

Ex parte Crenshaw, 80 Mo. 447, presents a distinction between what part of one order is imprisonment for debt and what part is not. One Holmes obtained a judgment of restitution in an action of unlawful detainer against petitioner Crenshaw. Pending appeal, the trial court enjoined Crenshaw from removing certain fixtures from the premises in suit. Crenshaw violated the injunction and the court ordered him to restore the fixtures. He failed to do so and the court found him guilty of contempt of court. He was ordered to pay Holmes his costs and expenses in the proceedings amounting to $150, also to pay a fine of $500, and to restore the removed fixtures and to be committed to jail until he had paid the two sums of money and had returned the property. Crenshaw was put in jail and he sought release by *habeas corpus* proceedings in this court. This court held that the order committing Crenshaw to jail until he should restore the fixtures was a lawful means to enforce compliance with the order of court. But it also held that the fine of $500 was unlawful under the statutes governing criminal contempt, and that that part of the order which directed Crenshaw to pay Holmes $150, costs and expenses, was in effect imprisonment for debt and therefore unconstitutional. Accordingly this court refused to order the discharge of Crenshaw from jail until he had obeyed so much of the order of the court below as commanded him to return the removed goods.

In State ex rel. Ames v. Barclay, Judge, etc., 86 Mo. 55, the relator sought prohibition against the respondent judge in whose court there was progressing an examination of relator touching his ability to satisfy a judgment against him. Relator admitted that he had ample means to pay the judgment but he declined to answer as to the location of his property. This court refused to grant prohibition. In so doing, it thus commented upon the objection that the relator Ames was about to be imprisoned for debt (86 Mo. 1. c. 58):

''The further objection, that to commit the relator for refusal to answer the questions is to imprison him for non-payment of a debt, is without merit. Imprisonment for debt is prohibited by the Constitution of this State. The statute in question does not go so far as to authorize the court to make an order on the debtor to turn over property to the officer, as is the law in many states. There is however no effort here to take the relator's body in execution for non-payment of debt. The court may examine him as to his means

and property, and his refusal to answer proper questions is a clear contempt of court. It is for this, and this alone, he is about to be committed. That there is no imprisonment for debt here, is the clear logic of Roberts v. Stoner, 18 Mo. 481; Coughlin v. Ehlert, 39 Mo. 285; Crenshaw's case, 80 Mo. 447.''

In the case of City of St. Louis v. Sternberg, 69 Mo. 289, the defendant appealed from a judgment imposing a fine for violation of an ordinance requiring persons practicing law to obtain a license and to pay the city collector $25 annually therefor. The judgment was attacked here on constitutional grounds. But this court upheld the judgment of the trial court. In its opinion it made a distinction which seems to be in point here (69 Mo. 288, l. c. 303):

''This is not a proceeding on the part of the city to collect the amount of license required by the ordinance, but is instituted to recover a fine for a breach of it committed by defendant in practicing law without such license, and although he may be subjected to the payment of the fine he would not thereby be entitled to the license. The mere fact that defendant did not procure the license does not create the liability, but the fact of his practicing as a lawyer without such license. It was his privilege to decline to pay the $25, the required sum for the license, and it was only when he continued or entered upon such practice without such license that he became liable to a fine. It is, therefore, the collection of the fine, and not the license tax, which is sought to be enforced in this proceeding.''

In Kansas City v. Pengilley, 269 Mo. 59, 189 S. W. 380, this court ruled that an ordinance which fixed taxicab rates and imposed a fine upon persons hiring cabs and refusing to pay the established rate was invalid because it violated Section 16, Article II of the Constitution. It was held that the ordinance made the mere failure to pay an offense punishable by imprisonment, and that the ordinance was not a proper exercise of the police power.

It thus appears from the cases applying and limiting the constitutional provision that the judgment of the court below ordering defendant Taylor to be committed to jail until he pays the fine imposed and the costs is not invalid.

III. Nor does the fact that the check upon which defendant Taylor was prosecuted was a postdated check relieve him from the penalty of the law. A postdated check is thus defined in 7 Corpus Juris, page 674: ''A postdated check is one containing a later date than that of delivery. The presumption is that the maker has an inadequate fund in the bank at the time of giving it, but that he will have enough at the date of presentation. Such a check is payable on or at any time after the day of its date, being in effect the same as if it had not been issued until that date.''

Concerning the presumption that the maker of a postdated check

has an inadequate fund in the bank at the time of giving it, but that he will have enough at the date of presentation, Corpus Juris cites Clarke National Bank v. Bank of Albion, 52 Barb. (N. Y.) 592, which thus states the rule: ''Postdated checks are instruments often used, and their nature and character are well understood by bankers and the trading community. By all such persons it is regarded that the drawer is not in funds at the bank on which he draws his check, when he makes and delivers the same, and does not expect to be, until the arrival of the date inserted in the check.''

Nor is a postdated check outside the classes of instruments at which Section 4305, Revised Statutes 1929, is directed. Our statute covers ''any check, draft or order, for the payment of money upon any bank or other depository.'' The California statute relates to ''any check or draft on a bank, banker, or depository for the payment of money.'' It should be noted that the two statutes use the words ''check or draft.'' In the case of People v. Bercovitz, 163 Cal. 636, 126 Pac. 479, 43 L. R. A. (N. S.) 667, the defendant sought a reversal of the judgment founded upon a verdict of guilty of uttering a postdated check in violation of the statute. He contended that a postdated check was not such an instrument as was intended to be described by the Penal Code. Of this contention the Supreme Court of California observed:

''We are of the opinion that these facts show the offense defined by Section 476a of the Penal Code, and that it is altogether immaterial that the check was dated February 6, 1911, when delivered during the evening of February 4, 1911. Even if we assume in accord with appellant's claim that, by reason of the fact that the instrument was postdated it was not a 'check' within the meaning of that word as used in Section 476a of the Penal Code, which we do not concede, it was clearly a 'draft,' the giving of which under such circumstances is likewise inhibited by the section, the language being 'any check or draft.' ''

The court quoted the statutory definition of the offense, and made this further comment:

''There is nothing in the language used having the effect of excepting a case from the operation of the statute merely because the 'check or draft' is postdated. It is essential, of course, that there should be on the part of one giving the check or draft both present knowledge of the insufficiency of funds and absence of credit with such bank, etc., to meet the check or draft in full upon its presentation, and an intent to defraud, but no reason is apparent why both of these elements may not exist as well in the case of a postdated check or draft as in the case of one bearing the date of its delivery.''

IV. All the elements of fraud appear to be in the transaction between Cooper and defendant Taylor. It is quite clear that

Cooper on June 26, 1930, parted with 400 pounds of twine in consideration of the undertaking of Taylor to pay for the twine and also to pay one-half of the old account by means of the postdated check for $163.50. Both Cooper and Taylor knew that the latter did not have in bank, on the day of delivery of the check, funds sufficient to meet it. But Taylor in effect represented that he would have enough money on deposit at the date of the check. Taylor's wife said to him when he was delivering the check to Cooper: "Now, Harold, suppose you fall down and can't pay that check?" Taylor looked at Cooper, laughed and said: "By God, I would be looking the penitentiary in the face." The record shows, as we have seen, that, when on July 27th, Taylor had on deposit in the Winston Bank about $139 and when on that day there were presented for payment three checks for $116, $4, and $163.50, respectively, he ordered the bank cashier to be sure to pay the two smaller checks, and he professed indifference as to the payment of the Cooper check for $163.50. In the state of Taylor's account this was in effect a direction to the banker to send back the Cooper check which the banker would have paid if Taylor had not preferred the smaller checks. Cashier Black also testified that, on the day after he sent back the Cooper check unpaid, Taylor deposited in the bank about $160. This with the balance to his credit from the day before was sufficient to pay the Cooper check. Yet Taylor gave no orders to bring about such payment, although Cooper, on July 29, demanded payment.

Cooper, on July 24th, deposited the Taylor check with other checks in his account at the First National Bank at Cameron. It is a reasonable presumption that according to the custom of bankers, Cooper was given at once credit for the full amount of the Taylor check and that he had the possession and use of the equivalent sum of money. When the Taylor check was received back on July 29th, it is in evidence that the bank at Cameron notified Cooper. It is a certainty that Cooper then parted with the sum of $163.50 for which the bank of deposit had given him credit. Either he gave his own check for the amount involved to the bank at Cameron, or, without that formality, the bank charged Cooper's account.

V. The question has been raised whether a postdated check is within the purview of Section 4305, Revised Statutes 1929, inasmuch as the payee of such a check, in accepting it, relies upon the maker's promise to do something in the future rather than upon an assurance, express or implied, that the check is good when given. To this it may be answered, as in the California case (People v. Bercowitz, supra) that there is nothing in the language used having the effect of excepting a case from the operation of the statute merely because the check is postdated. But a more complete answer is to be found in our own statutes. When Section 4305, Revised Statutes 1929, was enacted in 1917 (Laws 1917, p. 244), the Negotiable Instruments Law, en-

acted in 1905 (Laws 1905, p. 243) was on the statute books as it is today. Therefore the General Assembly in 1917, in using the word "check" in the insufficient funds statute, had in mind the definition of a check given by the Negotiable Instruments Law. That definition is as follows:

"A check is a bill of exchange drawn on a bank payable on demand. Except as herein otherwise provided, the provisions of this chapter applicable to a bill of exchange payable on demand apply to a check." [Sec. 2813, R. S. 1929, 1 Mo. Stat. Ann., p. 721.]

A bill of exchange, which a check is declared to be, is thus defined in the Negotiable Instruments Law (Sec. 2754, R. S. 1929, 1 Mo. Stat. Ann., p. 708):

"A bill of exchange is an unconditional order in writing addressed by one person to another, signed by the person giving it, requiring the person to whom it is addressed to pay on demand or at a fixed or determinable future time a sum certain in money to order or ·to bearer."

It is to be observed that neither the definition of a check nor of a draft says aught about a date. The essence of a check and of a demand draft is that the instrument is an unconditional order in writing to pay a sum certain in money *on demand.*

Pursuing the Negotiable Instruments Law further in our research what was in the minds of the General Assembly when it enacted Section 4305, we find that a check is a negotiable instrument. [Sec. 2630, R. S. 1929, 1 Mo. Stat. Ann., p. 644; Nelson v. Diffenderfer, 178 Mo. App. 48, 163 S. W. 271; John P. Mills Organization v. Bell, 37 S. W. (2d) 680.]

Therefore there are applicable to checks Sections 2640, 2641, 2642, Revised Statutes 1929 (1 Mo. Stat. Ann., p. 649), showing the complacent state of mind of the lawmakers toward the true dating, antedating, postdating, and nondating of negotiable instruments.

Sec. 2640. "Where the instrument or an acceptance or any endorsement thereon is dated, such date is deemed prima facie to be the true date of the making, drawing, acceptance or indorsements, as the case may be."

Sec. 2641. "The instrument is not invalid for the reason only that it is antedated or postdated: *Provided,* this is not done for an illegal or fraudulent purpose. The person to whom an instrument so dated is delivered acquires the title thereto as of the date of delivery."

Sec. 2642. "Where an instrument expressed to be payable at a fixed period after date is issued undated, or where the acceptance of an instrument payable at a fixed period after sight is undated, any holder may insert therein the true date of issue or acceptance, and the instrument shall be payable accordingly. The insertion of a wrong date does not void the instrument in the hands of a subse-

quent holder in due course, but as to him the date so inserted is to be regarded as the true date.''

From the foregoing it should clearly appear that the General Assembly in enacting the insufficient funds act (Sec. 4305) not only *did not* exclude a postdated check from the purview of that section but that it very definitely meant to include it.

These views are not changed by the theory that a postdated check is merely a statement of a future fact, promissory in its nature, namely that the drawer of the check will have on deposit in the drawee bank on the date of the check sufficient funds to pay the check. We are of opinion that this objection falls within the rule of State ex rel. St. Louis-San Francisco Railway Company v. Daues, 316 Mo. 474, 290 S. W. 425, the question in this court upon review by certiorari of an opinion of the St. Louis Court of Appeals was whether certain statements made by a claim agent of a railroad company as an inducement to a settlement with an injured passenger were misrepresentations of fact or were merely forecasts of what might happen in the future and promissory. In deciding that question against the relator railroad company this court said (290 S. W. l. c. 428):

''The rule that a forecast of what will happen in the future is merely promissory, and not a statement of existing fact, does not apply, where the matter involved is peculiarly within the speaker's knowledge. [26 C. J. 1090; Wendell v. Ozark Orchard Co. (Mo. App.), 200 S. W. l. c. 749; Stonemets v. Head, 248 Mo. l. c. 252, 253, 154 S. W. 108.] A statement may be promissory, or prospective, or an opinion in form, and yet state a fact. The present representation was that the Frisco Railroad was going into the hands of a receiver, and the plaintiff probably would not get over ten cents on the dollar. That implied a financial condition of the Frisco Railroad such as would carry it into the hands of a receiver. The agent was in better position to know the facts about that than the plaintiff. That was equivalent to saying that he believed it from knowledge in his possession, when in fact he had no such belief or knowledge, for he swore that he did not say it.''

The applicable statutes (Secs. 4305 and 4306, R. S. 1929), have an element of futurity in them. Section 4305 provides that any person shall be guilty of a misdemeanor who shall make or draw or utter or deliver, with intent to defraud, any check, draft or order for the payment of money upon any bank, etc., knowing at the time of making, drawing, etc., that the maker or drawer has not sufficient funds in, or credit with such bank upon its presentation. It is a matter of common experience that in the normal course of business most checks are not presented for payment at the instant time of or even upon the day of delivery to the payee. The test of sufficiency comes at the time of presentation. The maker of a check

may have on deposit, at the time of issuance of a check, sufficient funds to meet it. But he may also have outstanding other checks at the time of issuance of a particular check, which other outstanding checks, by their earlier presentation and payment, will reduce the money on deposit below the amount necessary to pay the particular check upon its later presentation. Of all these conditions a drawer of check must take account. "A check of itself does not operate as an assignment of any part of the funds to the credit of the drawer with the bank, and the bank is not liable to the holder unless and until it accepts or certifies the check." [Negotiable Instruments Law, sec. 2817, R. S. 1929, 1 Mo. Stat. Ann., p. 722.]

Section 4306 also has the element of futurity namely the time of presentation of a check to the bank on which it is drawn and refusal of payment at that time. Section 4306 is as follows:

Sec. 4306. "As against the maker or drawer thereof, the making, drawing, uttering or delivering of a check, draft or order, payment of which is refused by the drawee, shall be prima facie evidence of intent to defraud and of knowledge of insufficient funds in, or credit with, such bank or other depositary, *provided* such maker or drawer shall not have paid the drawee thereof the amount due thereon (together with the drawee thereof the amount due thereon), together with all costs and protest fees, within five days after receiving notice that such check, draft or order has not been paid by the drawee."

In the instant case, as we have seen, defendant, at the time of presentation of the check, had on deposit an amount of money which, with a small credit which the cashier was ready to give him, would have been sufficient to pay the check in evidence. But defendant directed the cashier to prefer and pay two other checks. The record also shows that, during the period of five days mentioned in Section 4306, defendant had on deposit enough clear money to pay the check held by Cooper. But defendant did not cause the money to be applied to that purpose. It is obvious that at the least there was the statutory prima facie evidence of fraud.

There is a similarity between Section 4306 quoted above and Section 4116, Revised Statutes 1929, now repealed. The latter section provided that any officer or director of a bank receiving or assenting to the reception of, deposits, etc., after having knowledge that the banking institution was insolvent or in failing circumstances, should be deemed guilty of larceny, and upon conviction punished as for stealing money of like amount, and added: "*Provided*, that the failure of any such bank or banking institution . . . shall be prima facie evidence of knowledge on the part of any such officer or person that the same was insolvent or in failing circumstances when the money or property was received on deposit."

The points of resemblance are that each statute makes the happening of a future event prima facie evidence of a wrongful act. Under

Section 4306 the future event is the refusal of payment by the drawee of the check involved and the failure of the drawer to make good the check within five days thereafter. In Section 4116 the future event was the failure of the bank subsequent to the receipt of the deposit. In each statute, the happening of the future event is only prima facie evidence of the fact to be proved. Concerning the bank deposit statute, Section 4116, this court recently said in State v. Shelby, 333 Mo. 1036, 64 S. W. (2d) 269, l. c. 274:

"The statute in effect makes the failure of the bank prima facie evidence of two essential elements of the crime denounced, viz: that the bank was in fact insolvent or in failing circumstances when the deposit in question was made, and that the accused had knowledge of such condition."

This court in the Shelby case and in prior decisions upheld the power of the General Assembly to declare by statute the rule of prima facie evidence laid down in Section 4116. The like power, asserted in Section 4306, is not questioned. And since the later section makes no distinction between predated, truly dated, postdated or nondated checks, the facts which the statute makes prima facie evidence should be applicable to postdated checks as well as to predated, truly dated or nondated checks.

Nor do we see merit in defendant's assignment of error which he thus states in his motion for a new trial.

"The court erred in giving Instruction No. 6 by not limiting the date of the issuance of the check to the 22nd day of July, 1930, and by inserting in said instruction 'or at any time within one year next before the filing of the information herein, to-wit on August 20, 1930' for the reason the instruction in the form presented authorized the jury to convict the defendant either for the redated check on the 22nd day of July, 1930, as alleged, or for the original issuance of the check which was on or about the 23rd day of June, 1930. The jury by said instruction were thus authorized to consider defendant's guilt for two offenses instead of being limited to one offense."

In the case of State v. Morro, 313 Mo. 98, 281 S. W. 720, 724, an instruction told the jury that if it found defendant had at any time within three years prior to the filing of the indictment embezzled $4,900 he should be found guilty. Defendant insisted that as there were a number of embezzlements and as defendant was charged with embezzling $4,900 on December 26, 1922, the instruction was erroneous because it should have directed the jury's attention to the particular embezzlement with which he was charged. This court ruled that assignment against defendant, he not having requested that the State be required to elect upon which act it would rely for conviction. To the same effect see State v. Hamilton, 263 Mo. 294, 172 S. W. 593.

In the instant case the defendant did not request that the State

be required to elect. Therefore his quoted assignment of error is wholly without merit.

VI. Other assignments of error are made in the motion for a new trial. We have examined them and find no merit in them. The judgment accordingly is affirmed.

PER CURIAM:—The foregoing opinion by FITZSIMMONS, C., in Division Two is adopted as the opinion of the Court en Banc. *Gantt, Hays, Ellison* and *Atwood, JJ.*, concur; *Frank, C. J., Leedy* and *Tipton, JJ.*, dissent.