GERARDA RIVERA DE RIVERA ET AL., Plaintiffs and Appellees, *v.* BANCO CRÉDITO Y AHORRO PONCEÑO, Defendant and Appellant.

No. 241.   Decided December 14, 1962.

*Miguel Marcos Morales* and *Miguel Marcos Contreras* for appellant.   *Guillermo Bauzá* for appellees.

Division composed of Mr. Justice Pérez Pimentel, as Chief Judge of Division, Mr. Justice Rigau, and Mr. Justice Dávila.

MR. JUSTICE DÁVILA delivered the opinion of the Court.

As a result of defendant bank having honored certain postdated checks, plaintiff's current account had insufficient funds to cover the amount of other antedated checks presented for collection and which were not therefore honored. Plaintiff alleges that this injured his credit. Together with his wife he brought an action for damages. The trial court awarded him $10,000 plus $600 for attorney's fees. We decided to review this judgment.

■ Section 13 of the Uniform Negotiable Instruments Act—19 L.P.R.A. § 13 (1961 ed.)—expressly recognizes the validity of a postdated check. That precept provides that "the instrument is not invalid for the reason only that it is antedated or postdated, provided this is not done for an illegal or fraudulent purpose. The person to whom an instrument so dated is delivered acquires the title thereto as of the date of delivery." Prior to the adoption of the statute by the Uniform Laws Conference in 1896, the validity of postdated checks was upheld. *Andrew & Wilson* v. *Blachly & Simpson*, 11 Ohio St. 89 (1860); *Mohawk Bank* v. *Broderick*, 13 Wendell 131 (N.Y. 1834); BRECKENRIDGE, *The Negotiability of Postdated Checks*, 38 Yale L. J. 1063 (1929).

■ Characteristic of a check is that it is payable on demand. It is so established by § 186 of the Negotiable Instruments Act—19 L.P.R.A. § 362 (1961 ed.)—*Álvarez* v. *National City Bank of N.Y.*, 46 P.R.R. 82 (1934). The fact that the check is postdated does not alter the situation. It is payable on demand as of the day of its date. *Wright* v. *Bank of America*, 176 Cal. App. 2d 176, 1 Cal. Rptr. 202, 76 A.L.R.2d 1293 (1959); *State* v. *Brookshire*, 329 S.W.2d 252 (Mo. 1959); *State* v. *De Nicoca*, 126 N.E.2d 62 (Ohio 1955); *State* v. *Taylor*, 73 S.W.2d 378 (Mo. 1934); *Kuflick* v. *Vac-*

*caro*, 170 N.Y. Supp. 13 (1918); *American Agricultural Chemical Co.* v. *Scrimger*, 100 Atl. 774 (Md. 1917); *Symonds* v. *Riley*, 74 N.E. 926 (Mass. 1905). Since postdated checks are payable as of the day of their date, if a bank pays them before that date it does so at its peril and can not charge payment against the drawer's account. *Smith* v. *Maddox-Rucker Banking Co.*, 68 S.E. 1092 (Ga. 1910); *Crawford* v. *West Side Bank*, 2 N.W. 881 (N.Y. 1885); 5A MICHIE, Banks & Banking 431, § 169 (1950 ed.); Annotation: *"Bank's Liability for Paying Postdated Check,"* 76 A.L.R.2d 1301 (1961); Comments, *"Post Dated Checks,"* 29 Yale L.J. 321 (1920). In order to avoid the consequences of premature payment, some banks include in current contracts clauses relieving them of liability in the event a check is paid before the day of its date.[1] *Kalish* v. *Manufacturers Trust Co.*, 191 N.Y.S.2d 61 (1959); *Montano* v. *Springfield Gardens Nat'l Bank*, 140 N.Y.S.2d 63 (1955); *In re Rousos Will*, 91 N.Y.S.2d 551 (1949); *Chase Nat. Bank of City of N.Y.* v. *Battat*, 78 N.E.2d 465 (1948); *Pyramid Musical Corp.* v. *Floral Park Bank*, 48 N.Y.S.2d 866 (1944). The Act expressly provides that there is no liability when the drawer pursues a fraudulent purpose in postdating the check. Negotiable Instruments Act, § 13—19 L.P.R.A. § 13—(1961 ed.)—*Republic Life & Accident Ins. Co.* v. *Hatcher*, 51 S.W.2d 922 (1932).

■ Having established that the bank could not charge against plaintiff's account the payment of postdated checks, the inescapable conclusion is that it incurred liability in refusing to pay other checks presented for collection and which were not honored for insufficiency of funds. *Maymí* v. *Banco Popular*, 63 P.R.R. 515 (1944); *Ríos* v. *National City*

---

[1] No evidence was introduced in the instant case to the effect that plaintiff and the bank had agreed that the latter would not be liable for payment of postdated checks, wherefore we need not pass upon the validity of this type of agreements.

*Bank,* 51 P.R.R. 473 (1937) ; *Smith* v. *Maddox-Rucker Banking Co., supra.*

We turn to consider the other questions raised. In the first place, the challenge of the trial court's determination to the effect that "as a result of the bank's refusal to honor the six checks, several firms from which plaintiffs purchased on credit for their business limited or closed their credit. As a result of this the business declined to such an extent that plaintiffs were forced into bankruptcy late in 1958 with a debt of over $36,000."

Let us analyze the evidence introduced. Plaintiff's current account in defendant bank revealed overdrafts on May 18, 1956 for $221.69; on June 18 for $330.25; on July 2 for $54.62; on July 20 for $4,286.57; on September 11 for $321.56; on October 23 for $107.97; on December 20 for $292.30; on December 24 for $528.20; on December 26 for $809.15; on January 18, 1957 for $87.78; on January 24 for $32.20; on January 28 for $20.80; on March 4 for $1,188.93. The documentary evidence therefore establishes that defendant bank consistently honored the checks drawn by plaintiff Nicomedes Rivera though there were not sufficient funds in his account to cover payment. From May 18, 1956 until March of the following year, defendant bank on 13 different occasions paid checks drawn by plaintiff notwithstanding he had no funds to cash them. This fact, in addition to establishing that the bank co-operated effectively with plaintiff facilitating payment of the checks drawn, shows, in the absence of justification, that the financial condition of plaintiff's business was not satisfactory. On December 19, 1956, the balance of the account was $16.36 and the bank honored all the checks presented for collection up to December 27, the amount overdrawn aggregating $809.15.

The incident of the returned checks occurred in March 1957. After the action was brought on February 14, 1959, two witnesses appeared and testified before Superior Judge

Romero. One of the witnesses was the accountant of the Royal Bank of Canada, Mayagüez Branch, who identified the signature on a letter which that bank wrote to plaintiff informing him that the check sent by him for credit to a promissory note was returned with the note "Refer to drawer." That letter further informed him that they ignored "the reason for returning the same and we urge you to make the arrangements necessary with your bank in order that the check be honored on further demand." The check referred to in the letter was one of those which defendant bank refused to pay. However, this same witness testified that in 1959 the promissory note, which was payable on demand, had not been paid off and that plaintiff was making partial payments. Yet, since it was a document payable on demand, the bank could have required payment thereof immediately after the incident of the check, but did not do so and continued to accept partial payments. Truly, plaintiff's credit in this institution was not affected. The witness further testified that plaintiff has not applied for further credit, and when he was asked whether they would extend any if he did, he answered, "We would have to consider the case." The other witness, a representative of Casa Blanes of Mayagüez, testified that plaintiff had an outstanding debt since prior to the incident of the checks which he had not paid off. The debt was incurred on December 24, 1956. He also had outstanding accounts of April 22, 1957 and May 28, 1958. It is clear that if his credit with Casa Blanes was affected, it was because of his failure to pay off these debts.

Plaintiff maintained a credit line with the firm of Argüelles brothers. One of them testified; however, from the documents offered it does not appear that plaintiff's credit was affected by the incident of the returned checks. The judge sums up the disclosures of the books of Casa Argüelles as follows:

"THE COURT: There is a balance here as of April 1955 of $13,000, $10,000, $8,000, $10,000. The balance continues in 1952, $7,000, $5,000, $2,000, $8,000; the year 1952 prevails, $10,000, $11,000, then $7,000, $8,000, $8,000, $9,000, $10,000, $8,000, $9,000. Then it begins to drop. I believe it is fair to say that as of 1951 the outstanding credit is approximately $9,000; that in 1956 it was reduced approximately to $3,000 to $4,000. The situation continues to be the same in 1957. In 1957 it went up. You may stipulate for the record, I invite the colleagues so as not to retain these documents here, that since 1951, when plaintiff's account with Argüelles was opened, the following data stand out: first, that from 1951 to 1956, inclusive, the outstanding credit is an average of about $9,000, more or less. From 1951 to 1955, inclusive. After 1956 there is a reduction in the credit of an average of approximately $3,000, in 1956 an average of $3,000 more or less; and this situation continues during 1957. In 1957 the first balance is that of June 21 of over $2,600, and then it increased to $3,000, $4,000, and even to $5,000, in August 1957. Then we have that from 1951 to 1955 the books show an average credit of about $9,000. In 1956 it was reduced to approximately $3,000. That this amount prevailed and then went up to $5,000 in August and September of that year, and that from there on it has continued to be between $2,000 and $3,000, as already stated."

This evidence did not show at all that Casa Argüelles restricted his credit as of April 1957. It continued to offer credit in accordance with plaintiff's needs. During 1957 it shows an increase over the previous year, a palpable demonstration that his credit with this firm was not affected.

Plaintiff used to purchase from two textile export firms in the United States, the Pacific Mills Fabrics, Inc. and Kay-Bee Export Co., Inc. He maintains that after April 1957 these two firms restricted his credit. Let us consider the evidence in that connection. Two representatives of these firms in Puerto Rico testified. They also introduced two letters which each of their firms wrote to plaintiff.

Rafael López Vázquez is the representative of these two entities in Puerto Rico. Since 1949 he did business with

plaintiff. He testified that in September 1957, or six months after the incident which gave rise to this action, Pacific Mills gave credit to plaintiff. The orders were confirmed, but he testified that "it seems that in view of the amount involved in the order, they requested certain information and the data which they received were not satisfactory, according to information." Thus, six months after April 1957 Pacific was willing to extend credit to plaintiff. Now then, when was the credit which had been extended to him in September restricted? Several months later, since on March 26, 1958 they wrote him a letter informing him that "the facts is that here (Mr. Rex) has to be guided by the reports and data available or received by him. They are strictly business people and they do not go by any kind of sentiments. On the other hand, if those reports are mistaken, they are always willing to consider any rectification accompanied by evidence." And the letter further says, "Our Department is simply a sales department, but the approval comes from them and in your case they did not give the approval and we had to cancel your order and whatever was invoiced. We regret the occurrence, for our desire is to sell and please our customers and friends. Perhaps when you make another trip to this city you may call on Mr. Rex and explain your situation to him."

This evidence certainly does not establish that the credit with Pacific almost one year after April 1957 was due to the incident of the checks returned. In the following September he was granted credit and it was not until the firm received a report that it restricted the same, but making it clear that he could show that such report did not reflect the reality of his business.

The letter sent by Kay-Bee Export Co., Inc. informed plaintiff that "as a result of information received from a reliable source that several of your checks were returned by the bank for insufficiency of funds, our credit department has rejected the order until such time as you send us copy

of your last statement of account and also a report from your bank."

This letter did not inform him that they had definitively withdrawn the credit. They required a statement of account and a report of the bank. Plaintiff could have sent them his statement of account and a report from the bank explaining the occurrence. He could have thus clarified the situation.

Lastly, let us consider the testimony of Juan Rivera. He has a stationery business. He sells to plaintiff on credit and opened to him a line of credit of $600 to $700. He was the drawee of one of the checks returned for the sum of $100. After the incident he sold to him only on a cash basis. This is the only evidence which establishes clearly that plaintiff's credit was affected by the incident of the checks.

■ Weighing the evidence as a whole, we can not conclude that the cause of plaintiff's economic setback was defendant's refusal to honor the checks. The evidence shows that his debts at the end of 1958 amounted to $36,000 and that he then underwent a reorganization procedure. Clearly there were other causes which gave rise to this situation. Since prior to April 1957 the bank account shows that he was frequently overdrawn and that the bank paid the checks. The firms with which he did business gave him credit after April 1957, and apparently already early in 1958, when his real economic condition could be appreciated, they started to restrict his credit.

In view of all these circumstances, we are of the opinion that the compensation awarded was excessive and that an award of $500 is more reasonable. It shall be payable to both plaintiffs because the cause of action exercised is one for damages which belongs to the community partnership. The award of attorney's fees will be eliminated. As thus modified, it will be affirmed.