STATE of Missouri, Respondent,

v.

Jerry HARDEN, Appellant.

No. WD 31696.

Missouri Court of Appeals,
Western District.

March 2, 1981.

As Modified On Court's Own Motion
March 30, 1981.

---

Willard B. Bunch, John Edward Cash, Kansas City, for appellant.

John Ashcroft, Atty. Gen., Jefferson City, Catheryn B. Starke, Asst. Atty. Gen., Kansas City, for respondent.

Before MANFORD, P. J., WASSERSTROM, C. J., and NUGENT, J.

WASSERSTROM, Chief Judge.

Defendant appeals from his conviction of passing a bad check with intent to defraud in violation of Section 570.120, RSMo 1978. The trial was to the court pursuant to defendant's waiver of trial by jury.

The only evidence was that adduced by the prosecution. That evidence showed the following facts. Prior to April 1979, Mr. and Mrs. Paul Cridlebaugh bought a Brockway truck from defendant without any untoward incident. Then, in April 1979, defendant approached the Cridlebaughs and offered to sell them another truck, a Kenworth, for $30,000. The Cridlebaughs responded that they did not need an additional truck. Defendant persisted with an attempt to consummate a sale by saying that he had someone who would be willing to pay him $6,500 for the old Brockway truck being used by the Cridlebaughs and that he would be willing to buy that truck from them with the intention of promptly reselling it.

The parties proceeded to agree upon a deal on April 20, 1979, under which the Cridlebaughs bought the Kenworth truck and defendant bought the Brockway truck. The defendant at that time gave the Cridlebaughs his check drawn upon the Bank of Osborn for $6,500. At the same time, the Cridlebaughs gave defendant their check for $12,000 for the purpose of paying off a lien for that amount which defendant said was owed on the Kenworth truck, so that clear title could be transferred to the Cridlebaughs. Defendant asked for an additional payment of $4,000 which would be applicable toward the balance due on the Kenworth. The Cridlebaughs at first suggested that they would return defendant's $6,500 check and the parties could treat that as payment toward the Kenworth. However, defendant demurred that "it would put him in too much of a high income tax bracket and that I [Mrs. Cridlebaugh] probably needed it to run my business with." The Cridlebaughs acquiesced, and did deliver to defendant a second check in the sum of the $4,000 requested.

On the date of that transaction, April 20, 1979, defendant had on deposit in the Bank of Osborn an account in the name "Jerry M. or Dolores L. Harden." At the opening of business on that day, that account had a balance of $10,360.17 and during the course of that business day the Cridlebaughs' $4,000 check was deposited. However, during the course of that day, seven checks were presented to the Bank of Osborn for payment, including one check in the amount of $11,650. At the close of banking business on April 20, the balance in the account was $2,439.29. From that time forward until September 18, 1979, the last date shown on the ledger sheet, the highest balance defendant ever had in his account was $2,605.57, and for the most part the balance was very substantially less; at no time from and after the close of business on April 20 did the account ever approach $6,500.

When the check given by defendant to the Cridlebaughs for $6,500 was presented to the Bank of Osborn, it was dishonored and returned for insufficient funds. De-

fendant called the Cridlebaughs and told them to redeposit the check. This they did, but the check was dishonored once again.

On May 4, 1979, the parties entered into an agreement under which defendant agreed to give credit for the $6,500 toward payment of the Kenworth truck. However, the Cridlebaughs were never able to get title to the Kenworth truck, and they finally discovered that the lien against the truck, held by White Motor Company, was $27,000 rather than the $12,000 which had been stated by defendant. At the time of trial, White Motor Company was in process of repossessing that truck. The Cridlebaughs managed to regain the Brockway truck by a replevin action against the one to whom it had been sold by defendant.

On May 16, 1979, the Cridlebaughs went to the Prosecuting Attorney who sent formal notice to defendant on that date that the check had not been honored because of insufficient funds. Defendant made no response within the statutory ten day period, and this prosecution was commenced.

Defendant's point relied on urges that the evidence was insufficient to support a conviction because: (1) the facts were insufficient to establish a statutory prima facie case, and; (2) absent the benefit of the statutory presumption, the evidence was insufficient to show that defendant wrote or knew of the checks which reduced the balance of the joint account below $6,500.

## I.

Section 570.120 makes it a crime to pass a bad check with purpose to defraud, knowing that it will not be paid by the drawee. Subparagraph 3 of that section provides: "If the issuer has an account with the drawee, failure to pay the check or order within ten days after notice in writing that it has not been honored because of insufficient funds or credit with the drawee is prima facie evidence of his purpose to defraud and of his knowledge that the check or order would not be paid."

Defendant relies upon the May 4th agreement as constituting substantial compliance on his part with the ten day provision and he argues that for this reason, the State does not have the benefit of the statutory prima facie case. That argument would be persuasive if the Cridlebaughs had entered into the May 4th agreement voluntarily and with full knowledge of all relevant facts. If that were true, the giving of credit toward the balance due on the Kenworth truck could be treated as a form of "payment" and thus a compliance with Section 570.120–3, and it would seem to be immaterial whether such "payment" occurred before rather than after the formal notice of dishonor. See in this connection, *State v. Mullins*, 292 Mo. 44, 237 S.W. 502 (1922).

The difficulty with this argument by defendant, however, lies in the fact that the Cridlebaughs obviously did not enter into the May 4th agreement with full knowledge of the facts. Defendant had misrepresented the amount of the lien against the Kenworth truck by saying that the amount due was only $12,000, whereas in truth the lien was $27,000. Crediting the Cridlebaughs' account in the amount of $6,500 did not put anything into defendant's hands which he could pay to White toward satisfaction of White's lien. Even if the credit could in some way be considered so available, adding the credit of $6,500 to the $16,000 already paid by the Cridlebaughs, the total of $22,500 would have been insufficient to pay off the lien. Certainly the $16,000 already paid was far in excess of defendant's $3,000 equity in the truck, and there was absolutely no reason for the Cridlebaughs to give defendant any more money or credit toward that equity. The purported credit of $6,500 given by defendant to them against the truck was wholly a figment of defendant's imagination. Any consideration for the credit was entirely illusory, and the May 4th agreement cannot be considered otherwise than as a continued part of defendant's fraudulent scheme.

The trial court was entirely justified in refusing to accept the May 4 "credit" as a payment. Accordingly, the State was entitled to rely upon the prima facie case as provided in Section 570.120–3.

## II.

Even if it could be said that the May 4 agreement precluded a statutory prima facie case, nevertheless any evidence of belated payment after dishonor does not constitute a full defense and the State would still be free to prove a purpose to defraud and knowledge on the part of defendant that the check would not be paid when presented. *State v. Kaufman*, 308 S.W.2d 333 (Mo.App.1957); *State v. Euge*, 349 S.W.2d 502 (Mo.App.1961); *State v. Euge*, 359 S.W.2d 369 (Mo.App.1962).

Here the evidence did suffice to show a purpose to defraud and guilty knowledge even aside from the statutory presumption. When defendant gave the $6,500 check on April 20, 1979, he was bound to know that the check would not clear through banking channels in normal course until some days later. An analysis of defendant's account with the Bank of Osborn shows that it was only momentarily during the business day of April 20 that there were enough funds on deposit to cover the $6,500 check, and there never was a sufficient amount from and after the close of business on that day. Defendant was legally bound to know when he gave his check to the Cridlebaughs that there were already other checks issued so that the total amount of all checks outstanding exceeded the amount on deposit. He is criminally accountable accordingly.

This governing principle was given expression in *State v. Taylor*, 335 Mo. 460, 73 S.W.2d 378, 384 (banc 1934). In that case, the defendant gave Cooper a check for $163.50. When that check was presented at the bank, the defendant had sufficient funds together with a credit which the bank would have extended against expected deposits so as to pay the Cooper check. However, there were already other checks outstanding which, together with the Cooper check, exceeded the amount available for payment. When the bank explained this situation to defendant, he told the bank to prefer the other checks, so that the Cooper check was refused. The court held the evidence sufficient to show that the defendant had knowledge that he had insufficient funds to pay the Cooper check:

"It is a matter of common experience that in the normal course of business most checks are not presented for payment at the instant time of or even upon the day of delivery to the payee. The test of sufficiency comes at the time of presentation. The maker of a check may have on deposit, at the time of issuance of a check, sufficient funds to meet it. But he may also have outstanding other checks at the time of issuance of a particular check, which other outstanding checks, by their earlier presentation and payment, will reduce the money on deposit below the amount necessary to pay the particular check upon its later presentation. Of all these conditions a drawer of checks must take account."

The same principle was applied on facts closer to those here in *Prince v. State*, 93 Tex.Cr.R. 230, 247 S.W. 863 (1923). In that case the defendant gave a check on July 25 when he had sufficient funds in his account with which to cover the check. By the time the check was presented on July 29, the account was no longer sufficient because of other checks which had been presented and paid in the meantime. It was held that the offense of passing a bad check had been proved:

"It was shown that, at some time during the business hours on the 25th of July, there stood to the credit of the appellant in the bank upon which the check was drawn an amount sufficient to pay it, but that during the business hours of that day, other checks, previously drawn by the appellant, were presented and his account became exhausted. He became aware of the condition of his account on the following day, and, so far as the record reveals, he had neither made nor undertaken to make any arrangements with the bank to have the check in question paid when it reached the bank upon which it was drawn. It thus inferentially appears that, at the time the check was drawn at 4 o'clock in the afternoon of the 25th of July, appellant was without funds

in the bank upon which it was drawn, and it affirmatively appears that he had previously issued checks sufficient to exhaust his account. We regard the evidence as quite sufficient to establish the averment in the indictment to the effect that, at the time the check was drawn, appellant was without funds in the bank, and had no good reason to believe that the check would be paid."

So also in *People v. Cundiff*, 16 Ill.App.3d 267, 305 N.E.2d 735, 739 (1973), a check was given on April 7 and was returned eight or nine days later marked insufficient. The court held that an offense had been proved despite the fact that there was sufficient money in the account at times after April 7:

"Defendant argues that because he had at one point in time over $8000 credited to his account on April 7 that he could not be found to have known that the check would not be paid by the depository.

"Generally the test of sufficiency of funds comes at the time of presentation of the check. Thus, where the drawer has sufficient funds in the bank to cover a check at the time he issues it, he may nevertheless be guilty under a worthless check statute if his funds or credit with the bank are insufficient for payment of the check at the time it is presented for payment, because he had other checks outstanding which, when presented, reduced his funds on deposit to a point where they were insufficient to cover the particular check when it was presented. 32 Am.Jur.2d, False Pretenses, Sec. 76; 35 C.J.S. False Pretenses Sec. 21, note 70."

Defendant seeks to escape on the argument that his bank account was joint with his wife, that she had the right to draw checks equally with him, and that there was no evidence that any of the checks charged against the account on April 20 were shown to have been written by defendant or with his knowledge. One answer to that contention is that defendant was responsible for knowing what checks were outstanding, whether drawn by him or his wife, when he gave his check to the Cridlebaughs. It was

so held in *Moore v. State*, 96 Okl.Cr. 118, 250 P.2d 46, 53 (1952), where the court held:

"Defendant was responsible for his bank account. If he permitted his son to check on his account, it was incumbent on him to know the condition of his account prior to the issuing of checks, and not only to know his balance, but to see that it was at all times sufficient to take care of checks that he would personally draw on the account. A different situation is presented from a case where some stranger would forge defendant's name to a check and thus deplete his account. The condition of the drawer's account at the time the check was issued is not conclusive as to his knowledge or lack of knowledge as to whether he had sufficient funds in the drawee bank to pay the check in full upon presentment. The question is, had he already drawn, or did he thereafter draw or authorize an agent to draw, checks against the fund in an amount sufficient to deplete the same before the check in question could in due course be presented for payment. *Huffman v. State*, 205 Ind. 75, 185 N.E. 131; *People v. Humphries*, 226 App.Div. 500, 234 N.Y.S. 688; *Jones v. State*, 123 Tex. Cr.R. 437, 59 S.W.2d 418, 95 A.L.R. 493."

Moreover, it will be noticed that one of the checks which cleared on April 20 was in the sum of $11,650, an amount surely not given for ordinary household expenses. A check for such a large amount, many, many times larger than any other which appears on the bank's ledger sheet for defendant's account, certainly must have been known by the defendant. Still further to be considered is the unusual insistence by defendant upon receiving a separate check from the Cridlebaughs in the amount of $4,000, while simultaneously handing them his $6,500 check, rather than simply giving them credit at that time for the $6,500 purchase price of the Brockway truck. A study of the ledger sheet on defendant's bank account leaves the indelible belief that he was insisting upon getting the $4,000 check so as to have enough funds to cover the mysterious $11,650 check. Also to be taken into account as showing a pattern of

fraudulent intent is defendant's misrepresentation as to the amount of the White lien.

Considering all these factors, the trial court was justified in finding beyond a reasonable doubt (even aside from the statutory presumption) that defendant had a purpose to defraud and that he knew when he gave his $6,500 check to the Cridlebaughs that the check would not be paid by the Bank of Osborn.

The judgment is affirmed.

All concur.