STATE ex rel. Stanley W. STANHOPE, Relator,

v.

Honorable Stephen R. PRATT, Judge, Circuit Court of Clay County, Respondent,

and

Honorable John C. Danforth, Attorney General of Missouri, Intervenor.

No. 59145.

Supreme Court of Missouri, En Banc.

March 8, 1976.

W. Harrison Norton, Kansas City, for relator.

Vincent F. Igoe, Jr., Liberty, for respondent.

Karen M. Iverson, Asst. Atty. Gen., Jefferson City, for intervenor.

HOLMAN, Judge.

This is an original proceeding in prohibition in which relator seeks to prevent respondent judge from ordering that he be committed to jail for contempt because of his failure to comply with an order to pay alimony to his former wife. When the petition was first considered we concluded that the facts were not sufficiently disclosed. This court accordingly entered an order directing respondent to hold a hearing and take evidence on certain issues and report his findings of fact and conclusions of law. Upon consideration of the findings so filed we issued our provisional rule on November 10, 1975. Because the case involves the constitutionality of Section 452.345 [1] enacted in 1973, effective January 1, 1974, the attorney general has been permitted to intervene in order to defend the constitutionality thereof. We have concluded that the provisional rule should be discharged.

In the underlying case the court granted a dissolution of the marriage of Wanda and Stanley W. Stanhope on January 13, 1975. As a part of the decree Wanda was granted judgment for maintenance for $350 per month against relator, the payments to be made to the circuit clerk. He was also ordered to make the payments of about $100 per month on some real estate owned as joint tenants by Wanda, her mother and relator.

From the outset relator failed to make most of the monthly payments for maintenance.

On April 30, 1975, the prosecuting attorney filed a motion for contempt, under

1. All statutory citations are to V.A.M.S.

§ 452.345 [2] in which it was alleged that relator was delinquent in his payments to the extent of $1,100, that the appropriate notice had been given, and prayed for an order to show cause against relator as to why he should not be punished for contempt.

A hearing was held on May 28, 1975, and at the conclusion thereof the respondent indicated that he would find relator guilty of contempt and impose a sentence of 60 days in the county jail and suspend the sentence subject to relator complying with the court's orders. At the request of relator's attorney respondent delayed entry of judgment in order to give relator time to seek prohibition.

We have concluded that the respondent's findings of fact are supported by the evidence and hence we will not set out the testimony heard at the hearings of May 28 and October 16, 1975. In lieu thereof we will set out a large part of the findings and conclusions of the respondent, as follows:

"1. That Stanley W. Stanhope was at the time of filing the Motion for Contempt delinquent in payment of maintenance owed in the amount of $1,100.00.

\* \* \* \* \* \*

"2. That at the time of the October 16, 1975 hearing, Stanley Stanhope was delinquent in payments of maintenance pursuant to Court order in the amount of $2,650.00.

\* \* \* \* \* \*

"4. That Respondent [Mr. Stanhope was designated as respondent in the trial court] married a Mrs. Carr on February 14, 1975,

thirty-one days after the Decree dissolving his marriage to petitioner.

\* \* \* \* \* \*

"6. That Respondent immediately and voluntarily undertook the responsibility of Mrs. Carr and her child.

"7. That Mrs. Carr was and is employed at Krogers as a checker where her annual income is ten to eleven thousand dollars; and that she receives no child support.

"8. That Respondent is and has for over twenty years been employed regularly at Navajo Freight Lines as an over-the-road driver, and is currently sixth of one hundred twenty-seven drivers in seniority.

"9. That during the term of this litigation Respondent was regularly employed; that there was sufficient work at Navajo for him and he had no problems with the availability of work.

"10. That at the time of Dissolution of Marriage, Respondent was driving regularly to Indianapolis, Indiana, such run paying $506.00 per week at that time, and now paying $520.00 per week.

"11. That in February, 1975, Respondent undertook a 'run' to Liberal, Kansas, which pays $450.00 per week.

"12. That both the run to Indianapolis and to Liberal go out of the terminal three times per week, although the Indianapolis run is longer and takes more time to perform.

"13. That in March of 1975, Respondent successfully bid the Liberal run and presently holds it, having the availability to earn $450.00 per week gross compensation.

---

2. Regarding maintenance payments Section 452.345 provides, in part, as follows: "4. If a party fails to make required payment, the circuit clerk shall send by registered or certified mail notice of the arrearage to the obligor. If payment of the sum due is not made to the circuit clerk within ten days after sending notice, the circuit clerk shall certify the amount due to the prosecuting attorney. The prosecuting attorney shall, with the consent of the obligee, promptly initiate contempt proceedings against the obligor.

"5. The prosecuting attorney shall assist the court on behalf of a person entitled to receive maintenance or support in all proceedings initiated under this section to enforce compliance with the order.

"6. If the person obligated to pay support has left or is beyond the jurisdiction of the court, the prosecuting attorney may institute any other proceeding available under the laws of this state for the enforcement of duties of support and maintenance."

"14. That the Respondent could have maintained the higher paying run to Indianapolis had he chosen to do so.

"15. That Respondent's year to date gross pay is $11,896.65.

"16. That from this, $3,679.33 has been deducted as follows:

| | |
|---|---|
| FICA | $ 695.94 |
| Federal Withholding | $ 2,704.23 |
| State Withholding | $ 279.16 |
| | $ 3,679.33 |

"17. That Respondent's approximate weekly net pay is $230.00 for the year 1975, but would be $300.00, if he made usual runs.

"18. That Respondent's annual earnings for 1973 and 1974 averaged $20,000.00.

"19. That in 1975 to date, Respondent has missed thirty-four days of employment for 'sick leave', although he has been under a doctor's care only once and has been to doctors only three times in his life.

"20. That in 1975 to date the Respondent has been absent from work for 'personal business—leave of absence' on five occasions, totaling thirty-one days.

"21. That Respondent is not compensated for days off due to either illness or leave of absence.

"22. That Respondent is allowed five weeks per year paid vacation, of which he may work two and be compensated simultaneously; and that Respondent has either used or applied for all weeks of vacation for this year.

\* \* \* \* \* \*

"24. That Respondent has paid only $500.00 in maintenance since the Decree of this Court, . . .

"25. That Respondent and his new wife each deposit their income in a joint checking account at the Kaw Valley Bank, from which all bills incurred by both are paid.

"26. That Respondent's former wife is employed as a waitress, on a part time basis, and earns approximately fifty dollars per week. That she was at the time of dissolution and still presently is in bad health.

"27. That although Respondent has undertaken the responsibility of a new wife and stepchild, his new wife contributes greatly to the support of the family unit.

"28. That Respondent has the ability and capacity to earn much in excess of what he has in fact earned to date in 1975.

"29. That Respondent, Stanley W. Stanhope, was in a position to comply with the maintenance order when payments were ordered and became due.

"30. That Respondent, Stanley W. Stanhope, is now in a position to comply with the maintenance order of this Court.

"31. That any alleged inability on the part of Respondent, Stanley W. Stanhope, to make payments for maintenance by order of this Court were the result of voluntary actions on his part with the intention of placing him in a position to avoid compliance with the order of this Court.

"32. That these actions include but are not limited to:

"(a) his subsequent marriage and acceptance of responsibility for Mrs. Carr and her son;

"(b) bidding on and maintaining a lesser paying job when he had the capacity and ability to maintain a higher paying job;

"(c) a greatly exaggerated amount of sickness and personal leaves without explanation totaling over two months out of ten of employable time and thereby reducing his earnings.

"33. That Respondent, Stanley W. Stanhope, is therefore in contempt of this Court's Order that the sum of $350.00 be paid monthly to the Clerk of the Circuit Court of Clay County for the support of his former wife, Wanda Stanhope.

"CONCLUSIONS OF LAW

\* \* \* \* \* \*

"2. That the Prosecuting Attorney's Motion for Contempt pursuant to Respondent's

non-payment of maintenance and Section 452.345 R.S.Mo., is proper under law.

\* \* \* \* \* \*

"4. That Section 452.345 R.S.Mo., is constitutional and not in violation of Article I, Section II of the Constitution for the reason that since this is a case of first impression pursuant to the amended version of dissolution law in the State of Missouri, previous case law in Missouri regarding payment of maintenance obligations is not controlling. Further, there are compelling public policy reasons which should allow a trial court to enforce its orders regarding maintenance. . . . Pursuant to Section 452.345, the Legislature has seen fit to provide the Court of general jurisdiction with the authority to enforce its orders for maintenance and child support. The vested interest of the State in the marital relationship, as well as the necessity for empowering a Court to enforce its orders by contempt citations where necessary are so compelling that any question relating to a Constitutional violation alleging as its basis 'imprisonment for debt', as Respondent's contention herein, must be determined against such contention of Respondent; and Section 452.345 R.S.Mo., and its implementation herein is found to be constitutional in all respects.

\* \* \* \* \* \*

"5. That Respondent's actions were deliberate, and he has wilfully failed and refused to make payments and is therefore in contempt of this Court.

"6. That a Citation finding Respondent to be in contempt of Court for non-payment of maintenance, such payments being through the Clerk of the Circuit Court as trustee, and sentencing Respondent to be incarcerated for such contempt does not constitute imprisonment for debt."

Relator contends that respondent's order finding him in contempt and his expressed intention to commit relator to jail is void because in violation of Art. I, Sec. 11, Mo. Const., which provides, "That no person shall be imprisoned for debt, except for nonpayment of fines and penalties imposed by law." The further contention that the portion of Section 452.345 providing for contempt proceedings is unconstitutional follows as a corollary.

As indicated, the question for decision is whether imprisonment for contempt of a person who is financially able to pay but fails and refuses to comply with an order of the court for payment of maintenance is in violation of the constitutional prohibition against imprisonment for debt.

The basic case upon which relator must rely is *Coughlin v. Ehlert*, 39 Mo. 285 (1866). In that case the court in an opinion which did not consider the question in depth held that, "An order for the payment of alimony is simply an order for the payment of money. Imprisonment for debt is abolished in this State. We think this was an imprisonment for debt only, and the commitment was without authority of law." Strange as it may seem, although *Coughlin* was decided 110 years ago, it has never been challenged or its validity reviewed in this court. Each district of the court of appeals have had some phase of the question presented to it. See, *Ex Parte Kinsolving*, 135 Mo.App. 631, 116 S.W. 1068 (St. Louis Dist.1909), *Harrington v. Harrington*, 233 Mo.App. 390, 121 S.W.2d 291 (K.C.Dist.1938), *Davis v. Broughton*, 382 S.W.2d 219 (Mo.App., Sp. Dist.1964), and *Partney v. Partney*,[3] 442 S.W.2d 117 (Mo.App., St. Louis Dist.1969). In those cases the courts referred to the fact that the great weight of authority was contra to *Coughlin* but that the court of appeals was bound to follow the decisions of the supreme court.

We understand that probably every state in the United States, except Missouri, has

---

3. We note that in this case an application to transfer was made to this court but that was prior to the enactment of Section 452.345

and this court apparently elected not to review the question at that time.

ruled that contempt imprisonment for failure to pay maintenance or child support is not imprisonment for debt in violation of the constitutional prohibition. In view of that it is indeed unusual that an assault on *Coughlin* has not been made in this court long ago. Trial judges have been concerned about the decision. Note the following: "At the hearing of the petition we were furnished with a very instructive paper, prepared by one of the circuit judges of this state, collating the decisions of the courts of other jurisdictions on the question of alimony, and all claimed to treat the allowance of alimony as not a judgment for a mere debt; the argument being that our state and one other state stand alone in treating it as a debt and in declining to imprison a party for failure to pay alimony awarded in a divorce proceeding. Whatever weight may be given to that argument elsewhere, we are precluded from yielding to it by the decision of our Supreme Court in the case of *Coughlin v. Ehlert,* 39 Mo. 285." *Kinsolving,* supra, 116 S.W. 1070. The other state referred to in the quote was likely Nebraska and it has since changed its rule. *Cain v. Miller,* 109 Neb. 441, 191 N.W. 704, 30 A.L.R. 125 (1922). More recently, Circuit Judge Fred E. Schoenlaub has written a very comprehensive and convincing article on the subject. 23 Journal of the Mo. Bar 396. Therein the judge pointed out that Missouri stands alone in following the *Coughlin* rule and that the soundness of *Coughlin* had never been presented to this court for review. He also called attention to the fact that the fundamental theory of *Coughlin* had been greatly eroded by decisions of Missouri courts in many analogous situations upholding imprisonment for contempt.

Notwithstanding the Schoenlaub article no challenge to *Coughlin* came until this case and two others submitted on the same day. Apparently when the legislature enacted Section 452.345 indicating that contempt was a proper proceeding to enforce payment of maintenance the attorneys and trial courts concluded that such could be used and a situation was presented for testing the validity of the *Coughlin* rule. Incidentally, the legislature, which is presumed to have known of *Coughlin,* by enacting that section apparently concluded that that case was not sound and it at least entertained the hope that we would no longer follow it. Some light on the subject is contained in an article discussing that section as follows: "Contempt is available under the Act only in cases where payment is ordered to be made to the circuit clerk and the obligor defaults. The proceedings for contempt are then initiated by the prosecuting attorney. The Missouri Bar Family Law Committee, which proposed the Act to the legislature, was aware that Missouri remains one of the few states holding that alimony and prior support awards cannot be enforced in contempt proceedings, as imprisonment for 'debt.' *Coughlin v. Ehlert,* 39 Mo. 285, and *Partney v. Partney,* 442 S.W.2d 117 [Mo.App.]. It was hoped, however, that the procedure provided in the Act would be upheld as was the Reciprocal Uniform Support of Dependents Act and the Criminal Non-Support Statute, Section 559.-353, under *State v. Davis,* 469 S.W.2d 1 [Mo.]." Dissolution of Marriage Under Missouri's New Divorce Law, 29 Journal of Mo. Bar 518.

The reasoning upon which the courts of the other states base their decisions is indicated in the following authorities: "In the majority of the states the usual method of enforcing an order in a divorce action, whether the order is for alimony pendente lite, permanent alimony, or counsel fees, suit money, or costs, is by means of a commitment for contempt of court after notice to the husband and a demand for payment. The rule is based upon the ground that the refusal is wilful disobedience, and that where a party is guilty of wilful disobedience, or obstinacy, to an order of the court, the court is empowered to punish for contempt and sentence him to imprisonment until the specified sum or costs are paid. Although statutes frequently provide for

enforcing the payment of alimony by attachment for contempt, nevertheless a court has the inherent authority to enforce payment in this way even in the absence of such a statute. . . . Even though the constitutions of the various states commonly prohibit imprisonment for debt it is widely held that the payment of alimony pendente lite, counsel fees, costs, suit money, and permanent alimony may be enforced by imprisonment for contempt of court since alimony, whether temporary or permanent, or an award for attorneys' fees, does not constitute a debt within the meaning of such constitutional provisions. . . ." 24 Am.Jur., Sections 754, 755, pp. 861, 863 inclusive. ". . . as a general rule, the award of alimony in suits for divorce, or in suits for separate maintenance without a divorce, is not a debt within constitutional prohibitions against imprisonment for debt; and the willful refusal to pay an alimony award is not within the constitutional prohibition; nor does imprisonment for the failure to pay such alimony, together with attorney fees or court costs, or both, constitute imprisonment for debt. However, it has been held that imprisonment will not be allowed for the nonpayment of alimony where defendant is unable to pay the amount." 16 C.J.S. Constitutional Law § 204(2), p. 1006. "Since failure to pay alimony is fundamentally contempt of the decree of the court, under most authorities a judgment, order, or decree for alimony or attorney's fees may be enforced by contempt proceedings. Such proceedings have been justified on the ground that alimony is not a mere debt, or that it constitutes the highest form of debt or sacred obligation, or a continuing duty, tinged with a public interest. So, it has been held public policy to punish a husband by contempt when he willfully refuses to comply with an order to pay alimony." 27B C.J.S. Divorce § 259, p. 91.

In *Ex Parte Phillips*, 43 Nev. 368, 187 P. 311 (1920) the court stated that, "A debt in the sense used in the Constitution alludes to an obligation growing out of a business transaction, and not to an obligation arising from the existence of the marital status, such as alimony; nor is alimony given as a judgment. It is a mere allowance for support and maintenance—a duty growing out of the marriage status; a duty which sound public policy sanctions to compel one who is able so to do, possibly as a result of the co-operation (during coventure) of his former wife, to prevent such former wife from becoming a public charge or dependent upon the charity of relatives or friends. 'It has frequently been insisted,' says Mr. Nelson, 'that a decree for alimony is in fact a debt, and therefore payment should [not] be enforced by an attachment for contempt where the Constitution prohibits imprisonment for debt. But it is uniformly held, and such is the [true] doctrine, that the decree for alimony is an order of the court to the husband, compelling him to support his wife by paying certain sums, and thus perform a public as well as a marital duty. Such a decree is something more than an ordinary debt or judgment for money. It is a personal order to the husband, similar to an order of the court to one of the officers or to his attorney. The imprisonment is not alone to enforce the payment of money, but to punish the disobedience of the party; and the order is not, therefore, a debt, within the meaning of the Constitution.' Nelson Div. & Sep. § 939."

Many of the cases from other states are cited and discussed in Anno. 30 A.L.R. 130. Hundreds of other cases may be found in the various editions of the American Digest System, Divorce, ⟳269(1). Two of the older cases containing a good discussion of the question are *Hurd v. Hurd*, 63 Minn. 443, 65 N.W. 728 (1896) and *West v. West*, 126 Va. 696, 101 S.E. 876 (1920).

It will be noted that many of the cases refer to the duty of the husband to pay maintenance and that he may be held in contempt for failure to comply with such orders. It should perhaps be stated that the new Dissolution of Marriage law provides that maintenance may be granted to either spouse. Section 452.335. And that

in the case of *Ex Parte Risner*, 67 Cal. App.2d 806, 155 P.2d 667 (1945) the wife was committed to jail for contempt for her failure to pay to her husband alimony pendente lite as ordered by the court.

As indicated, we are of the view that the *Coughlin* opinion is not sound and that *Coughlin* and the court of appeals cases that have followed it should no longer be followed. This court, in making its decisions, has never followed the weight of authority just because it was the weight of authority. We have always been independently convinced of the merits in addition to considering weight. In this case, however, where Missouri stands alone and all of the other states and the District of Columbia have a contrary view, reasonable minds must have serious doubts as to the soundness of our decision. Although law is not an exact science it is simply not reasonably likely that Missouri is correct in its decision on the instant issue and all of the other courts are wrong. Therefore, we are somewhat influenced by a consideration of the weight of authority.

Considering specifically the *Coughlin* case we note that the court did not mention or consider the many particular factors that distinguish an order for payment of maintenance or child support from an ordinary debt. Without discussion the court merely stated that alimony was a debt and since imprisonment for debt was prohibited the petitioner should be discharged. Also, *Roberts v. Stoner*, 18 Mo. 481 (1853), the only case cited in *Coughlin* does not, in our opinion, support the decision. Moreover, we think subsequent somewhat analogous decisions of the appellate courts have greatly eroded any principle that may have evolved from *Coughlin*. For example, in *In re Knaup*, 144 Mo. 653, 46 S.W. 151 (1898), at a post judgment examination of the debtor it developed that he had possession of certain bonds. The court ordered that he deliver the bonds to a receiver and upon refusal committed him to jail for contempt. This was held not to violate the constitutional provision against imprisonment for debt.

In *Ex Parte Devoy*, 208 Mo.App. 550, 236 S.W. 1070 (1921) an heir was ordered to deliver possession of a dwelling house to a receiver during pendency of a will contest. He refused, contending that ejectment was the appropriate remedy. His imprisonment for contempt was upheld.

In *State v. Taylor*, 335 Mo. 460, 73 S.W.2d 378 (1934) it was held that the statutes making it a criminal offense to fraudulently give an insufficient funds check in payment of a past due account does not violate the constitutional provision against imprisonment for debt. In *Ex Parte Fuller*, 330 Mo. 371, 50 S.W.2d 654 (1932) the petitioner, a merchant, had obtained radios on consignment. Upon suit by the seller he was ordered to deliver the radios or proceeds from the sale thereof to a receiver. Upon refusal he was committed. While the court held that the trial court's findings did not support the order it is significant to note the statement that, ". . . we do not hold that petitioner's inability to comply with the order would excuse him if such inability was the result of his own voluntary act in disposing of the money with the intention of placing himself in a position to avoid compliance with the order. In other words, if the court had found, on substantial evidence, that petitioner had the proceeds of the sale of the property in his possession or under his control at the time the order directing him to deliver same to the receiver was made, or that he so held the money prior to the making of the order, but disposed of or converted it in anticipation of the order and to avoid compliance therewith, such a finding of facts would have authorized the court's conclusion that petitioner wrongfully, illegally, and contumaciously misapplied, misappropriated, and converted same to his own use, . . ."

*Ex Parte Fowler*, 221 Mo.App. 325, 273 S.W. 195 (1925) is a case wherein the petitioner was committed for contempt for failure to turn over to an administrator pendente lite $4,512.94 he was found to have in his possession as executor. This was held

not to violate the prohibition against imprisonment for debt. Likewise, in *Zeitinger v. Mitchell*, 244 S.W.2d 91 (Mo.1951) it appeared that a party in a discovery of assets proceeding had been found to possess money due an estate. The court (in accordance with a statute) committed him for failure to deliver the money to the administrator. This was held not to violate the imprisonment for debt provision. *State v. Davis*, 469 S.W.2d 1 (Mo.1971) is a case in which defendant was convicted for failure to provide support for his children in violation of Section 559.353 and was sentenced to jail. The statute was held not to be unconstitutional in violation of the provision which forbids imprisonment for debt.

It is also of interest to note that Section 454.240, as a part of the Uniform Reciprocal Enforcement of Support Law, gives the court power to punish a defendant for contempt for violation of any relevant order of the court. While this provision has not been tested we observe that it was enacted in 1959 and apparently has not been challenged.

▆▆▆ We have ruled that trial courts are henceforth empowered to punish by imprisonment for contempt the failure of a person to comply with orders for payment of maintenance and child support. In that connection we consider it prudent to say that this is a rather drastic remedy which should be carefully and cautiously exercised. Before ordering imprisonment trial courts should be convinced that the person is financially able to make the required payment or that he has intentionally and contumaciously placed himself in a position so that he could not comply with the court's orders. Also, we think the trial courts, in the exercise of a sound discretion, may require that the party seeking the contempt order make reasonable efforts to collect by the conventional remedies available before entering the contempt order.

We accordingly rule that the provisional rule in prohibition should be discharged.

It is so ordered.

HENLEY, FINCH and DONNELLY, JJ., concur.

BARDGETT, J., dissents in separate dissenting opinion filed.

SEILER, C. J., and MORGAN, J., dissent and concur in separate dissenting opinion of BARDGETT, J.

BARDGETT, Judge (dissenting).

I respectfully dissent from the result reached in this case. We are here concerned first of all with *the order* the trial judge declared he would issue unless prohibited. The trial court did not set forth the precise terms of its proposed order nor do the parties do so in their pleadings and briefs other than to say that the trial judge, in open court, advised the parties and their attorneys that he (trial judge) was going to find relator in contempt of court and sentence him to sixty days in the county jail. This threatened order seems to be the subject of this case. The transcript of the trial court proceedings of May 28, 1975, indicates that if the circuit judge found relator in contempt he would impose a sentence of sixty days in jail and would suspend imposition of the sentence subject to this relator paying the maintenance as he is supposed to do and living up to the other orders of the court.

Regardless of which order it was that the court declared its intent to issue, one thing is clear and that is that the circuit judge was going to sentence the relator to jail for a fixed period as punishment for failing to pay the maintenance provision of the divorce decree in the past. As to past and overdue maintenance, there is no question in my mind but what it is a judgment debt due and owing and this is so regardless of whether the divorce decree used the words "judgment", "order", or "decree", or all three. The word "order" is used because at the time a decree awarding maintenance is issued, it looks to the future and it is not at that time (when entered) a judgment of a

sum then due and owing as are most other awards of money. But on each date the maintenance is due and not paid, it automatically increases the sum then due and as such the judgment increases.

Nevertheless, I would uphold the constitutionality of the contempt powers afforded by section 452.345 as a special means of obtaining compliance with maintenance orders to the extent that the contempt proceedings and orders do not offend against the constitutional prohibition to imprisonment for debt.

In this case, it is my opinion that the contempt proceedings and the threatened order do offend against the constitutional prohibition to imprisonment for debt.

In the related case of *Teefey v. Teefey,* 533 S.W.2d 563 (Mo. banc 1976), of this date, this court holds that the contempt is a civil contempt and not criminal contempt. That holding is based upon this court's conclusion that the proceedings under section 452.345 are for the benefit of the party entitled to collect maintenance. I agree that, at most, proceedings under 452.345 are civil and not criminal contempt. Section 452.345(4) clearly leaves it to the discretion of the recipient of the maintenance as to whether or not to initiate contempt proceedings. These proceedings, therefore, are not to vindicate the dignity of the court but rather solely to effectuate collection of maintenance.

Being civil contempt, the contemnor must, at the time he is cited, be able to purge himself of the contempt by the doing of some act that is then and there within his power and ability to perform. He must hold the key to the jailhouse, as the function of this type of contempt is to coerce the doing of an act which act satisfies the order of the court. In order to convict for civil contempt, it is necessary that the contemnor have the ability to comply. *White v. Hutton,* 240 S.W.2d 193 (Mo.App.1951). *White v. Hutton* was a habeas corpus by petitioner who had been adjudged in contempt for failing to comply with a judgment in a proceeding to discover assets of an estate and ordered confined in jail until he delivered the sum of $2,000 to the administratrix or until otherwise released by order of court. The appellate court considered various aspects of the problem of the use of contempt to obtain compliance with court orders or judgments not immediately pertinent here. But the court did say at 202–203, "but there appears no authority for the application of the penalty for failure to comply with the judgment of the court for delivery of specific property or the value thereof, when there is no finding that the party charged *has the same in his possession or control.* If such a judgment under the conditions last described has any force or effect at all, which we do not here determine, it would be, at most, a mere judgment for debt, for the default of which no contempt and imprisonment could apply. If it purports to be a judgment to be enforced by attachment and imprisonment as for contempt, then it lacks an essential element to make it so, namely the finding of present possession or control."

It is true that in *White v. Hutton,* the statute required that the party charged "has them in his possession or under his control", and section 452.345 does not specifically so provide. But that element must be read into section 452.345 if this is civil contempt or else the imprisonment obviously would not be to coerce compliance but rather to simply punish for past failure to pay and that, I submit, would be imprisonment for debt pure and simple.

In this case the evidence received by the trial court on October 16, 1975, was that relator had $68 in a joint bank account with his present wife. There was also substantial evidence that petitioner had earned about $450 per week over the previous several months, as well as evidence of the financial needs of petitioner, his present wife, and his former wife, and that on October 16, 1975, petitioner was delinquent in payments of maintenance in the amount of $2,650. There is nothing in the record to

show that petitioner had $2,650 as of the date the court threatened to imprison him. There was an earlier hearing on May 28, 1975, at which time petitioner was delinquent in the amount of $1,100. There is nothing in the record to show he had $1,100 as of the date the circuit court first threatened to imprison him.

The trial court on October 28, 1975, following the hearing on October 16, 1975, found that petitioner was able to pay the maintenance sums as they became due. The trial court also found that petitioner is *now* in a position to comply with the maintenance order. I do not know whether this finding of *present* ability refers to an ability to pay up the delinquent amount or to pay the next month's maintenance. Nor can I determine what petitioner must do to be released from jail. As noted supra, I find no evidence that petitioner had the present ability (October 28, 1975) to pay the delinquent amount. The threatened contempt order does not recite the contemptuous conduct nor does it delineate specifically what petitioner must do to purge the civil contempt.

The trial court found that petitioner's failure to pay maintenance was a voluntary act on his part done with the intent of placing himself in a position to avoid compliance with the order (maintenance provisions of divorce decree). This finding seems to be based upon the fact that petitioner remarried shortly after his divorce from Mrs. Stanhope and thereby took on other responsibilities rather than pay his own maintenance. The record supports the finding that petitioner remarried thirty-one days after being divorced from Mrs. Stanhope. While I am not certain that it makes any difference anyway, there is no evidence that he married his present wife for the purpose of avoiding payment of maintenance.

At the October 16, 1975, hearing, the driver supervisor of the trucking company for which petitioner works testified. He produced the paycheck petitioner would receive that day. The amount of that check is not shown in the record but the evidence was that petitioner's last paycheck was for a net amount of $331.95. Had the court seen fit to do so, it could have ordered petitioner to endorse that paycheck which was present in court over to his former wife or made an order directing petitioner to immediately pay part of it over to his former wife. That was an act which petitioner could perform just as in the cases cited in the principal opinion where a court ordered a party to do a specific act such as delivering bonds in his possession or delivering possession of a house. *In re Knaup,* 144 Mo. 653, 46 S.W. 151 (1898); *Ex parte Devoy,* 208 Mo.App. 550, 236 S.W. 1070 (1921).

Also, under section 452.350, the court can order the party obligated to pay maintenance or support to execute an assignment for part of his earnings and the employer must comply. If the party ordered to execute the assignment refuses, then I believe the court can utilize coercive imprisonment to obtain compliance with the order to execute an assignment. Again, however, this is something the obligor has the ability to do and the doing of it releases him from jail.

*Ex parte Phillips,* 43 Nev. 368, 187 P. 311 (1920), cited in the principal opinion, was habeas corpus to obtain the release of petitioner who had been held in contempt of court for failure to make a certain payment ordered in a contempt proceeding. In the contempt proceeding of December 3, 1918, the court found that petitioner had not fully complied with the alimony award set out in the divorce case, that he was able to make certain payments thereon and pay in the future a monthly sum on account thereof, and accordingly issued an order that he pay forthwith and thereafter make certain monthly payments to plaintiff in the action. Failing to comply with the last mentioned order, petitioner was, on August 11, 1919, adjudged in contempt of court and as pun-

ishment it was ordered that he be confined in the county jail unless a certain payment was made. Failing to make the payment, a commitment was issued to the sheriff from which petitioner sought discharge.

Phillips's primary contention was that alimony is a debt and that a party cannot be imprisoned for nonpayment of a debt. The court held that alimony was not a debt in the ordinary sense, as set out in the principal opinion here, and that "The imprisonment is not alone to enforce the payment of money, but to punish the disobedience of the party . . . ."

In support of its holding as to contempt, the Nevada court quoting from *Gompers v. Buck's Stove & Range Co.,* 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797, said at 187 P. 312: " 'If a defendant should refuse to pay alimony, or to surrender property ordered to be turned over to a receiver, or to make a conveyance required by a decree for specific performance, he could be committed until he complied with the order. * * * The order for imprisonment in this class of cases, therefore, is not to vindicate the authority of the law, but is remedial, and is intended to coerce the defendant to do the thing required by the order for the benefit of the complainant. *If imprisoned,* as aptly said in *Re Nevitt,* 8 Cir., 54 C.C.A. 622, 117 F. 448, 451, *"he carries the keys of his prison in own pocket." He can end the sentence and discharge himself at any moment by doing what he had previously refused to do.'* " (Emphasis mine.)

In *Phillips* there appears to be no contention by petitioner that he could not make the payment at the time of his commitment on August 11, 1919, and because of the language quoted supra I must assume that the record in that case showed he could make the payment for which he was held in contempt for not making at the time of his incarceration. I say this because the Nevada court relied upon a holding of the United States Supreme Court in which it is said that, " 'he carries the keys of his prison in

own pocket.' He can end the sentence and discharge himself at any moment by doing what he had previously refused to do."

The Nevada court would not have held that Phillips could release himself from imprisonment without knowing from the record that he had the ability to do so. That ability had to mean that Phillips then and there had the money but refused to pay it over. If he did not have the money when he was committed to jail, then he could not release himself. This ability to pay, in my opinion, cannot refer back to an earlier date when a monthly payment was due because that earlier ability could simply not function as present ability to make the payment and be released from jail. I regard *Phillips* as a finding of contempt for failure to comply with a specific court order when he has the present ability (at the time he is imprisoned) to comply.

The *past ability* to pay the running alimony award as payments became due could not be the present possession of the jailhouse key when the order of commitment requires the payment *now* to secure release. The key must be able to open the door and it is only *present* ability to pay and the use of that present ability that can do that.

In *Coughlin v. Ehlert,* 39 Mo. 285 (1866), the petitioner did not have the ability to pay the alimony at the time he was imprisoned. After holding that a party cannot be imprisoned as for contempt for failing to pay alimony when due, the court went on to say, loc. cit. 286: "We do not mean to say that a party may not be put in contempt for disobeying a decree for the performance of acts which are within his power and which the court may properly order to be done. If it were shown, for instance, that the party had in his possession a certain specific sum of money, or other things, which he refused to deliver up under the order of the court for any purpose, it may very well be that his disobedience would be a contempt for which he might lawfully be imprisoned. But the order must be for the performance

of some specific act other than the mere payment of money."

On its facts, I believe the result in *Coughlin* was right. Apparently *Coughlin* has been understood to mean that a court cannot order a person obligated by a divorce decree to pay alimony to pay the sum due even if he has the money available to pay it at the time he is held in contempt and the court so finds. Section 452.345 now allows the use of civil contempt in domestic relations cases and I would modify *Coughlin* and hold that a court can order a person to pay over a sum due on a maintenance award and, if the party then and there has the present finances to comply and fails to do so, imprison him for a reasonable time or until he sooner complies, or the order is satisfied by other legal means such as attaching funds of the contemnor. In so doing, we would be recognizing that the keys to the prison must *presently* be in the pocket of the contemnor and not merely be giving lip service to that requirement reference civil contempt.

In this case, the proposed order is not sufficiently specific as to what the specific basis for the contempt is nor as to what petitioner must do to obtain his release. It is for a fixed period of sixty days. But, more importantly, the record establishes that petitioner did not have the present financial means to pay the maintenance due when the court threatened to imprison him. Therefore, he did not "hold the keys in his pocket". I would therefore make the writ of prohibition absolute as to the proposed order. For these reasons I dissent.