IN THE MISSOURI COURT OF APPEALS
 WESTERN DISTRICT
SUSAN ANN TAORMINA )
 )
 Appellant, )
 )
v. ) WD84334
 )
MARC KENNETH TAORMINA, ) Opinion filed: December 21, 2021
 )
 Respondent. )

 APPEAL FROM THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
 THE HONORABLE JAMES F. KANATZAR, JUDGE

 Division Three: Lisa White Hardwick, Presiding Judge,
 Gary D. Witt, Judge and Edward R. Ardini, Jr., Judge

 Susan Taormina (“Wife”) appeals from a judgment entered by the Circuit Court of Jackson

County denying her motion for contempt and granting Marc Taormina’s (“Husband”) motion to

terminate maintenance following their divorce. We affirm in part, reverse in part, and remand to

the trial court.

 Factual and Procedural Background

 Husband and Wife married in 1981, and in 1989, they adopted a daughter. In 2006,

Husband and Wife were divorced pursuant to a judgment entered by the Circuit Court of Jackson

County.1 In the divorce decree, the trial court ordered Husband to pay maintenance to Wife in the

1
 The parties participated in arbitration to resolve disputes about the distribution of property, maintenance, child
support, and child custody. The arbitrator issued findings of fact and conclusions of law, which were adopted by the
circuit court.
amount of $2,650 per month beginning in April 2006.

 Husband paid the ordered maintenance until November 2019. In February 2020, Wife filed

a motion seeking to hold Husband in contempt for failing to pay the ordered maintenance. In April

2020, Husband filed a motion seeking an order terminating or, in the alternative, modifying the

award of maintenance, alleging that Wife was in a relationship that was a substitute for marriage

and that there had been substantial and continuing changes in Wife’s circumstances. Wife was not

personally served with this motion, but a response was filed by counsel on her behalf on April 24,

2020.

 A hearing was held on the motions during which Husband and Wife testified. The evidence

showed the following:

 When Husband and Wife were married, Husband worked as a physician and Wife did not

work. Wife had received a bachelor’s degree in exercise and physical education but had never

pursued employment in that field. When Husband and Wife adopted their daughter (“Daughter”),

the parties agreed that Wife would stay home to parent Daughter.

 In 2006, when the parties divorced, the marital assets totaling $5,765,684 were divided

between the parties. Wife was awarded 52.6% of the assets, including a home in Lee’s Summit, a

home in Arizona, half of the couple’s brokerage, checking, and savings accounts, half of the

couple’s retirement funds, and a $520,000 equalization payment from Husband. The divorce

decree also awarded maintenance to Wife in the amount of $2,650 per month. In determining the

maintenance amount, the decree stated that Wife’s reasonable monthly expenses were $8,976, that

Wife was capable of earning an average of $1,000 per month, and that Wife had insufficient

income-producing marital property to support herself.

 Sometime in 2006, while the divorce was pending, Wife began a relationship with Scott

 2
Burton (“Burton”). Burton is the owner and president of Prestige Pool Company. Wife first met

Burton when he installed a pool for Husband and Wife.

 Also in 2006, Wife started a business selling custom poolside furnishings. Although Wife

claimed that she did not make any money in this venture and did not intend to go into business

with Burton, Burton’s company became the managing member of Wife’s limited liability company

in 2009. In 2016, Wife sold her business to Burton’s company for $25,000.

 At some point, Wife and Burton began living together and, in 2009, Wife moved with

Burton to Las Vegas. Wife purchased a lot in a suburb of Las Vegas for $282,000. Nearly five

years later, Wife and Burton built a home on the land. Before beginning the building process, Wife

deeded the land to Burton in exchange for $10. Wife testified that she did this because she could

not get a loan on her own because she lacked the necessary stream of income. Wife estimated that

she and Burton each contributed $500,000 to the home. According to the Clark County, Nevada

tax rolls, the home is worth $1.8 million.

 Wife and Burton traveled extensively, including flying in Burton’s private plane. Burton

gave Wife gifts, such as all-inclusive Superbowl tickets. Burton was present at many of Wife’s

family events, including graduations, engagements parties, and weddings. Despite living together,

spending time with each other’s families, and admitting that they were intimate, Wife claimed that

her relationship with Burton was a “businesslike relationship.” Wife insisted that Burton did not

assist with her monthly expenses and they had no agreement to support each other.

 Wife was an employee at Prestige Pool Company, performing miscellaneous work as

needed, which usually required between twenty and forty hours of work per week. At the time of

the hearing, Wife had worked for Burton’s company for twelve years. For this work, Wife was

paid a salary of $1,416 per month and received fringe benefits including health insurance, a cell

 3
phone, a company car, and a company credit card for gas and other expenses totaling

approximately $1,263 per month.

 In addition to her salary and benefits, Wife also received $973 per month in Social Security

benefits and $1,836 per month from investments. Wife claimed that her monthly expenses included

$1,685 toward balances on credit cards and other debts, including loans from Burton,

approximately $926 toward mortgage payments, $435 for homeowner’s association fees, $720 for

a personal trainer, $750 for maintenance and repairs to her home, $300 for gifts, and $200 for

vacations.

 Wife asserted that her assets at the time of trial exceeded $3 million, including $2,500 in

household or personal items, $2,133,733 in securities, and half of the value of the home she shared

with Burton worth approximately $1.8 million. Many of Wife’s assets were kept in a trust, to which

Burton was listed as the beneficiary.

 Wife claimed that, although she was a salaried employee at Burton’s company, she was

physically unable to work full-time due to a back injury.2 Wife testified that she was permanently

disabled but that she has never applied for disability benefits. Wife also stated that she had been

diagnosed with several other medical issues since 2006, including a blood disorder, spine issues

treated by a cervical fusion, and central thrombocytosis.3

 In 2016 or 2017, Daughter became engaged.4 The invitation stated, “[Husband] and [his

current wife] and [Wife] and [Burton] invite you to the wedding of their daughter.” Husband was

2
 Though Wife indicated that she was disabled and could not work, Wife completed several half marathons, including
one in September 2016.
3
 Wife sought a letter from one of her physicians regarding her conditions, however, when the doctor indicated that
he believed she was doing well, Wife became frustrated and left the office. Wife testified that she believed she had
previously been diagnosed with a terminal illness and, when her doctor denied this was true, she was upset that she
had believed she was dying.
4
 Daughter’s now husband, who she met at culinary school, also worked for Burton’s pool company.

 4
upset by this wording, believing that it meant that Wife and Burton “were listed as a couple and

inviting people to the wedding and giving away their daughter.” In October 2019, Daughter was

married in Las Vegas. In addition to Husband, Burton also shared a father-daughter dance with

Daughter. The wedding was “extravagant[,]” and Burton shared in the costs, including by paying

for a $5,000.00 bottle of wine, hotel rooms to house guests, and approximately one million

Southwest Air points to fly guests to Las Vegas. Burton also provided $10,000 to Wife for

Daughter’s wedding dress, which Wife characterized as a loan.

 Husband stopped paying maintenance after the wedding. His last payment to Wife was in

October 2019.

 The trial court granted Husband’s motion to terminate maintenance retroactive to October

31, 2019, finding that “there have been changed circumstances so substantial and continuing as to

make the terms of [the previous order] unreasonable.” The trial court specifically noted the

following changes in circumstance:

 A. [Wife] is now receiving income from Social Security benefits;

 B. [Wife] is cohabitating with Scott Burton and her reasonable expenses are being and
 should be shared by and through that relationship;

 C. [Wife] has reached an age where her retirement investments may be drawn upon
 for her reasonable expenses without financial penalty;

 D. [Wife’s] reasonable expenses at the time of the underlying decree have been
 reduced;

 E. [Wife] can and has worked 40 hours a week.

The trial court also found that Wife’s “relationship with Mr. Burton has long ago achieved a status

of a permanent relationship. [Wife] and Mr. Burton are and have been for some time holding

themselves out as man and wife in all significant respects.” The trial court based this finding on

the events surrounding Daughter’s wedding, the “commingling of [Wife and Burton’s] joint

 5
holdings and title to real estate,” that Wife’s expenses “are covered through her relationship with

Mr. Burton, including health and auto insurance, cell phone, car, vacations and travel, wedding

and other expenses related to [Daughter], mortgage installments on real estate[.]” The trial court

further explained that Wife’s salary supports the finding that Wife and Burton have an agreement

to support each other:

 [Wife] claims she is unable to work full time, but draws a salary from Mr. Burton
 for 20 to 40 hours a week of work. This obvious contradiction leads the Court to
 only one of two possible conclusions: One, [Wife] is able to work and earn a full-
 time income, or the salary she receives from Mr. Burton is in reality direct payments
 by Mr. Burton to cover [Wife’s] reasonable expenses, again evidencing that [Wife]
 and Mr. Burton are committed to, and in fact are in, a committed relationship and
 can support one another’s reasonable financial needs[.]”

 Finally, the trial court determined that “many of [Wife’s] expenses are unreasonable and if

eliminated would significantly mitigate the costs of her reasonable expenses. Such expenses

include $750.00 a month for a personal trainer.”

 Based on the trial court’s granting of Husband’s motion to terminate maintenance, it also

denied Wife’s motion for contempt. Wife appeals from the trial court’s judgment.

 Standard of Review

 “‘Our review of a ruling on a motion to modify maintenance is governed by Murphy v.

Carron, 536 S.W.2d 30, 32 (Mo. banc 1976).’” Hopkins v. Hopkins, 449 S.W.3d 793, 797 (Mo.

App. W.D. 2014) (quoting Haynes v. Almuttar, 25 S.W.3d 667, 671 (Mo. App. W.D. 2000)). “We

will sustain the trial court’s judgment modifying maintenance ‘unless there is no substantial

evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares

the law, or unless it erroneously applies the law.’” Thomas v. Thomas, 171 S.W.3d 130, 132 (Mo.

App. W.D. 2005) (quoting Murphy, 536 S.W.2d at 32) (additional citation omitted). “This Court

gives great deference to the trial court’s superior opportunity to adjudge the credibility of witnesses

 6
and the weight given their testimony.” Barden v. Barden, 546 S.W.3d 582, 588 (Mo. App. E.D.

2018) (citation omitted). Therefore, “[a]ll evidence and reasonable inferences therefrom are

viewed in the light most favorable to the trial court’s judgment, and all evidence and inferences to

the contrary are disregarded.” Archdekin v. Archdekin, 562 S.W.3d 298, 304 (Mo. banc 2018)

(citing Landewee v. Landewee, 515 S.W.3d 691, 694 (Mo. banc 2017)).

 Discussion

 Wife raises three points on appeal.5 In her first point, Wife claims that the trial court

misapplied the law in terminating maintenance retroactive to October 2019, arguing that section

452.370.6, RSMo, allows for modification of a maintenance award only as to maintenance that

accrues subsequent to the date of personal service of the motion to modify. In Point II, Wife asserts

that the trial court erred in denying her motion for contempt, arguing that Husband voluntarily

ceased paying maintenance prior to filing his motion to terminate or modify maintenance. Finally,

in Point III, Wife alleges that the trial court erred in terminating maintenance, arguing that Husband

“failed to meet the burden established in RSMo. §452.370 that requires . . . a showing of changed

circumstances so substantial and continuing so as to make the terms of the original judgment

unreasonable.” For ease of understanding, we address Wife’s points out of order.

5
 We note that Wife’s Points II and III are multifarious in violation of Rule 84.04(d). Pursuant to that rule, each distinct
claim of error must be raised in a separate point. See Librach v. Librach, 575 S.W.3d 300, 307 (Mo. App. E.D. 2019).
In Point II, Wife alleges that the judgment is “against the weight of the evidence, not supported by substantial evidence,
and misapplied the law[,]” thus invoking three of the four categories of error from Murphy, 536 S.W.2d at 32. In
contrast, in Point III, Wife does not identify which category of error she alleges the trial court committed. “We are
‘under no obligation to review briefs which do not conform to the rules of procedure.’” Librach, 575 S.W.3d at 307
(quoting Carden v. Mo. Intergovernmental Risk Mgmt. Ass’n, 258 S.W.3d 547, 557 (Mo. App. S.D. 2008)). However,
we can, at our discretion, review points of error despite their deficiencies “where meaningful appellate review is
possible.” Id. (citation omitted). “Indeed, we prefer to resolve an appeal on the merits of the case rather than dismissing
for failure to comply with Rule 84.04.” Id. (citing Maskill v. Cummins, 397 S.W.3d 27, 31 (Mo. App. W.D. 2013)).
Here, although Wife’s Points II and III are deficient, we are able to discern her claims of error from the argument
sections; therefore, we will gratuitously exercise our discretion to review Wife’s Points II and III.

 7
 Husband’s motion to terminate maintenance (Point III)

 We begin by addressing Wife’s third point, in which she asserts that the trial court erred in

terminating spousal maintenance pursuant to section 452.370, RSMo, specifically claiming that

the law “requires a judgment of maintenance may only be modified by a showing of changed

circumstances so substantial and continuing so as to make the terms of the original judgment

unreasonable.” Wife then lists ten factual or legal arguments:

 a. The original decree and judgment of dissolution did not include a provision for
 termination of support based upon cohabitation;

 b. [Husband] presented no proof that [Wife] and [Burton] held themselves out to be
 husband and wife;

 c. [Wife] was sixty-nine (69) years old at the time of the trial and her health had been
 declining;

 d. The value of the property originally awarded to [Wife] had decreased by nearly
 $1,000,000;

 e. [Wife] never received the return on her investments that had been originally
 calculated;

 f. [Wife] was not required to expend all of her property to continue to receive
 maintenance;

 g. The court failed to consider that the expenses of [Wife] were reasonable;

 h. [Wife] was not able to support herself through appropriate employment;

 i. Any change in circumstances had occurred over ten years prior to the termination
 by the court;

 j. [Husband] had acquiesced to the changes[.]

In the argument section for this point, Wife argues that each of the changed circumstances the trial

court found did not support the trial court’s termination of maintenance.

 Section 452.370.1, RSMo,6 allows a court to modify a maintenance award “‘upon a

6
 All statutory references are the Missouri Revised Statutes (2016).

 8
showing of changed circumstances so substantial and continuing as to make the terms of the

original decree unreasonable.’” Hopkins, 449 S.W.3d at 798 (quoting Brooks v. Brooks, 957

S.W.2d 783, 786 (Mo. App. W.D. 1997)). When considering whether such substantial and

continuing change has occurred, the court “shall consider all financial resources of both parties,

including the extent to which the reasonable expenses of either party are, or should be, shared by

a spouse or other person with whom he or she cohabits, and the earning capacity of a party who is

not employed.” § 452.370.1, RSMo. It is this state’s public policy that “maintenance is awarded

for the sole purpose of ‘providing support until the more dependent spouse can achieve a

reasonable self-sufficiency[.]’” Wagner v. Wagner, 542 S.W.3d 334, 339 (Mo. App. E.D. 2017)

(quoting Hammer v. Hammer, 139 S.W.3d 239, 244 (Mo. App. W.D. 2004)) (additional quotation

and citation omitted). “Maintenance should never be awarded as a reward or punishment, and

certainly should not serve ‘the purpose of building an estate or accumulating capital.’” Id. at 340

(quoting Arndt v. Arndt, 519 S.W.3d 890, 900 (Mo. App. E.D. 2017)).

 The trial court found that the following circumstances supported terminating maintenance:

 A. [Wife] is now receiving income from Social Security benefits;

 B. [Wife] is cohabitating with Scott Burton and her reasonable expenses are being and
 should be shared by and through that relationship;

 C. [Wife] has reached an age where her retirement investments may be drawn upon
 for her reasonable expenses without financial penalty;

 D. [Wife’s] reasonable expenses at the time of the underlying decree have been
 reduced;

 E. [Wife] can and has worked 40 hours a week.

Wife claims that none of these circumstances warrant the termination of the maintenance award

contained in the original decree. We disagree. Viewing the evidence in a light most favorable to

the judgment, the trial court did not err in finding that these facts constituted “changed

 9
circumstances so substantial and continuing as to make the terms of [the original decree]

unreasonable.” Because we find Wife’s cohabitation with Burton and their sharing of expenses to

be a sufficient change in circumstances to render the original maintenance award unreasonable,

we address only that circumstance.

 As stated above, section 452.370.1, RSMo, provides that when considering whether

changed circumstances are sufficiently substantial and continuing to make a maintenance award

unreasonable, the trial court must look to “the extent to which the reasonable expenses of either

party are, or should be, shared by a spouse or other person with whom he or she cohabits[.]” This

requires evidence that “the relationship is of a nature that it substitutes as a marriage.” Hopkins,

449 S.W.3d at 798. “Rather than focusing on cohabitation itself, it seems the best way of

formulating rules that [deal] with cohabitation, is to embrace the rule that the economic

implications of cohabitation for the spouse receiving maintenance must be addressed before the

maintenance award may be modified, suspended or terminated.” Lombardo v. Lombardo, 992

S.W.2d 919, 923 (Mo. App. W.D. 1999). “This approach still allows the trial court to ‘evaluate the

new relationship created by the spouse receiving maintenance to determine whether equity justifies

termination or modification of maintenance on the basis of that changed condition.’” Id. (quoting

Herzog, S.W.2d at 268).

 “‘Where the relationship has achieved a permanence sufficient for the trial court to

conclude that it has become a substitute for marriage, equitable principles warrant a conclusion

that the spouse has abandoned [her] rights to support from the prior marriage and is looking to the

new relationship in that regard.’” Hopkins, 449 S.W.3d at 798 (quoting Herzog v. Herzog, 761

S.W.2d 267, 268 (Mo. App. E.D. 1998)). “‘Permanence may be found from either the time

involved or the intentions of the persons involved.’” Id. (quoting Herzog, 761 S.W.2d at 268-69).

 10
“‘Where a permanent relationship exists . . . the level of support obtained therefrom is, as with

remarriage, irrelevant.’” Id. (quoting Herzog, 761 S.W.2d at 269).

 Here, the trial court found that Wife’s “relationship with Mr. Burton has long ago achieved

a status of a permanent relationship.” Evidence supporting this finding included that Wife and

Burton had been in a relationship since 2006 and had been cohabitating since at least 2009 when

Wife moved with Burton to Las Vegas. Wife and Burton shared the expenses of building and

maintaining a home; Burton provided Wife with expensive gifts and travel in a private plane; and

Burton attended and planned life events involving Wife’s family. Burton was significantly

involved in Daughter’s life, which was evidenced by his participation in her 2019 wedding both

personally, by including his name on the invitation and participating in a father-daughter dance,

and financially, by paying for travel and lodging accommodations for guests and for a $5,000

bottle of wine. Burton also provided Wife with salaried employment at his pool company for

performing as-needed work. This employment included health insurance, a cell phone, a company

car, and a company credit card. In addition, Wife listed Burton as the beneficiary on her trust.

 While Wife asserted at the hearing that her relationship with Burton was that of friends or

business associates, the trial court clearly did not find that characterization credible. We will defer

to the trial court on issues of credibility. Barden, 546 S.W.3d at 588. Indeed, there was sufficient

evidence that Wife’s relationship was a substitute for marriage and to support the trial court’s

finding that such relationship and its attendant benefits constituted “changed circumstances so

substantial and continuing as to make the terms of [the original judgment] unreasonable.”

Therefore, the trial court did not erroneously determine that maintenance should be terminated.

 Point III denied.

 11
 Retroactive termination of maintenance (Point I)

 Next, we address Wife’s first point, in which she asserts that “the trial court had no

jurisdiction to terminate spousal maintenance prior to the date of service of the motion to modify

as §452.370.6 states an order may be modified only as to support or maintenance installments

which accrued subsequent to the date of personal service[,] and therefore, the trial court misapplied

the law.”7

 Section 452.370.6, RSMo, states, in relevant part:

 The court shall have continuing personal jurisdiction over both the obligee and the
 obligor of a court order for . . . maintenance for the purpose of modifying such
 order. . . . The order may be modified only as to . . . maintenance installments which
 accrued subsequent to the date of personal service. . . .

Both parties agree that Wife was not personally served with Husband’s motion to terminate

maintenance. However, a response to the motion was filed on April 24, 2020. Wife asserts that,

pursuant to section 452.370.6, RSMo, the trial court’s termination of maintenance could be

effective no earlier than the date her response was filed.

 In response, Husband directs us to sections 452.370.3 and 452.075, RSMo, and argues that

his maintenance obligation terminated upon Wife’s “remarriage” which occurred at the latest in

October 2019.8 Section 452.370.3, RSMo, states that “[u]nless otherwise agreed in writing or

expressly provided in the judgment, the obligation to pay future statutory maintenance is

terminated upon . . . the remarriage of the party receiving maintenance.” Similarly, section 452.075

7 While Wife alleges that the trial court was without jurisdiction to terminate Husband’s maintenance obligation prior

to the date allowed by section 452.370.6, RSMo, this complaint is more properly characterized as a challenge to the
trial court’s authority to terminate maintenance in that manner as the trial court had both personal and subject matter
jurisdiction over the parties and the motion to modify. See J.C.W. ex rel. Webb v. Wyciskalla, 275 S.W.3d 249, 254
(Mo banc 2009) (stating that jurisdictional challenges in the circuit courts are those exclusive to personal and subject
matter jurisdiction).
8
 We note that Husband references these specific statutory provisions for the first time on appeal.

 12
states, “. . . the remarriage of the former spouse shall relieve the spouse obligated to pay support

from further payment of alimony to the former spouse from the date of the remarriage, without the

necessity of further court action[.] . . .” Wife did not remarry, therefore, sections 452.370.3 and

452.075, RSMo, do not apply, and Husband’s maintenance obligation did not terminate by

operation of either of those provisions.9

 “In interpreting statutes, we are to determine the intent of the legislature, giving the

language used its plain and ordinary meaning.” Scruggs v. Scruggs, 161 S.W.3d 383, 390 (Mo.

App. W.D. 2005) (citation omitted). “If the intent of the legislature is clear and unambiguous,

giving the language used its plain and ordinary meaning, then we do not resort to statutory

construction.” Id. (citation omitted). “In determining legislative intent, we are to read the statute

as a whole and in pari materia with related sections.” Id. (citation omitted).

 Sections 452.370.3 and 452.075, RSMo, specifically reference “remarriage,” not

cohabitation. The term “remarriage” is clear and unambiguous and is not synonymous with

cohabitation. See § 451.010, RSMo (“Marriage is considered in law as a civil contract[.]”);

§ 451.040, RSMo (“no marriage contracted shall be recognized as valid unless the license has been

previously obtained, and unless the marriage is solemnized by a person authorized by law to

solemnize marriages.”). Indeed, absent a marriage license, solemnization of the marriage by an

authorized person, or common law recognition, automatic termination of a maintenance obligation

without court action under section 452.075, RSMo, is not triggered. See Kunce v. Kunce, 459

S.W.3d 443, 447 (Mo. App. W.D. 2015).

 In contrast, cohabitation does not require any legal formalities. Parties cohabitate in many

9
 As noted in Hopkins and Lombardo, “the effect of cohabitation on a maintenance award is an area the legislature
may choose to examine further.” Hopkins, 449 S.W.3d at 800 n.5 (quoting Lombardo, 992 S.W.2d at 923). However,
“[u]nless and until the legislature [does so], we are bound to apply the law as written[.]” Id.

 13
contexts and for different reasons. To address the amorphousness of cohabitation relationships, the

trial court is required, under section 452.370.1, RSMo, to determine if the specific aspects of the

relationship constitute “changed circumstances so substantial and continuing as to make the terms

[of the original decree] unreasonable.” As stated above in our discussion of Point III, the trial court

must “‘evaluate the new relationship created by the spouse receiving maintenance to determine

whether equity justifies termination or modification of maintenance on the basis of that changed

condition.’” Lombardo, 992 S.W.2d at 923 (quoting Herzog, 761 S.W.2d at 268). Only then, after

the trial court has determined that cohabitation has “reached a level of permanence sufficient to

conclude that the receiving spouse ‘has abandoned his or her rights to support from the prior

marriage and is looking to the new relationship in that regard,’” can the trial court modify or

terminate maintenance. Id. (quoting Herzog, 761 S.W.2d at 268). The determination of whether a

relationship involving cohabitation constitutes a substitute for marriage thus requires judicial

findings that are not required by section 452.075’s allowance for the termination of maintenance

without court action upon remarriage.

 Permitting a former spouse to unilaterally terminate maintenance payments based upon the

other former spouse cohabitating with another individual absent judicial action (or the need to even

file a motion to modify) ignores that it is the trial court’s duty to determine whether the

cohabitation relationship is of such a nature, character, and significance to permit termination or

modification. Such a reading would not comport with our rules of statutory construction and

disregards our case law finding that cohabitation does not automatically terminate a maintenance

obligation. See Kunce, 459 S.W.3d at 447 (Mo. App. W.D. 2015) (determining that maintenance

does not automatically terminate “without a marriage license, solemnization of the marriage by an

authorized person, or common law recognition[.]”); Hopkins, 449 S.W.3d at 800 (stating that the

 14
wife’s cohabitation did not require the automatic termination of the husband’s maintenance

requirement when the trial court found that the cohabitation was not a substitute for marriage).

 Here, Wife did not remarry. Thus, section 452.075’s immediate termination of maintenance

without court action has no application to this situation. Instead, the trial court was bound by

section 452.370.6, RSMo, which permits modification of an award of maintenance “only as to

. . . maintenance installments which accrued subsequent to the date of personal service. . . .”

Because Wife was not personally served with the motion to modify, the operative date in this case

became April 24, 2020, when a response to the motion was filed on her behalf. See Willis v. Willis,

50 S.W.3d 378, 391-92 (Mo. App. W.D. 2001) (holding that the trial court erred in terminating

maintenance before the wife was served or entered an appearance). The trial court misapplied the

law in ordering that Husband’s maintenance obligation terminated nearly six months earlier on

October 31, 2019. Therefore, we must remand this case to the trial court for entry of a date on or

after April 24, 2020, that maintenance terminated.

 Point I granted.

 Wife’s motion for contempt for failure to pay (Point II)

 Finally, we address Wife’s second point, in which she claims that the trial court “erred in

denying [her] application for contempt for failure to pay spousal maintenance as previously court

ordered[,]” arguing that the denial “was against the weight of the evidence, not supported by

substantial evidence, and misapplied the law, in that, [Husband] admitted he voluntarily ceased to

pay spousal maintenance in accordance with the provisions of the original judgment months prior

to filing his motion to terminate and/or modify maintenance.”

 To prove a prima facie case of civil contempt, Wife was required to show that Husband

was required to pay maintenance and failed to do so. Smith v. White, 67 S.W.3d 742, 746 (Mo.

 15
App. W.D. 2002). “Once that prima facie case was established, the burden then shifted to

[Husband] to show that [his] noncompliance was not ‘an act of contumacy.’” Id. (quoting Watkins

v. Watkins, 839 S.W.2d 745, 747 (Mo. App. W.D. 1992)). “The purpose of a civil contempt order

is to compel compliance with the relief granted in an order, judgment, or decree.” Jones v. Jones,

296 S.W.3d 526, 528 (Mo. App. W.D. 2009) (citation omitted). “Contempt is a ‘drastic remedy

which should be carefully and cautiously exercised.’” Gerau v. Gerau, 927 S.W.2d 441, 443 (Mo.

App. E.D. 1996) (quoting State ex rel. Stanhope v. Pratt, 533 S.W.2d 567, 575 (Mo. banc 1976)).

“In civil contempt cases, the trial court’s judgment will not be disturbed on appeal absent a clear

abuse of discretion.” Id. (citation omitted).

 Here, the trial court purported to terminate Husband’s maintenance obligation retroactive

to a time when, as found supra, it was legally unable to do so. Therefore, because Husband does

owe some amount of maintenance that he admitted to willfully failing to pay, we must remand to

allow the trial court to consider whether Husband’s failure to pay maintenance under the original

divorce decree was “‘an act of contumacy’” that constitutes civil contempt. Smith, 67 S.W.3d at

746 (quoting Watkins, 839 S.W.2d at 747).

 Point II granted.

 Conclusion

 The judgment of the trial court is affirmed in part, reversed in part and remanded with

instructions to the trial court to enter a date no earlier than April 24, 2020 upon which Husband’s

maintenance obligation terminated and to reconsider Wife’s motion to hold Husband in contempt

for failing to pay overdue maintenance.

 __________________________________________
 EDWARD R. ARDINI, JR., JUDGE

All concur.

 16