In re the MARRIAGE OF Donna Jean SCOTT and Jay Garrett Scott.

Donna Jean SCOTT, Petitioner–Respondent,

v.

Jay Garrett SCOTT, Respondent–Appellant.

No. 16419.

Missouri Court of Appeals, Southern District, Division Two.

July 11, 1990.

Thomas D. Carver, Springfield, for petitioner-respondent.

John S. Pratt, Pratt and Fossard, Springfield, for respondent-appellant.

MAUS, Judge.

The trial court found respondent, Jay Garrett Scott, willfully and contumaciously placed himself in such a financial position that he was unable to pay $75,788.59 in delinquent maintenance and child support to petitioner, Donna Jean Scott. Respondent was adjudged to be in contempt and committed to jail until he purged himself of contempt by paying such delinquency. The trial court retained jurisdiction until the contempt has been purged. The judgment further provided "[i]n the event the respondent shall be unable to purge himself of contempt within a reasonable time, this Court shall then consider the viability of a work-release program, payback plan or other alternative method of purging the contempt." The respondent was committed to jail and released on bond. He states two points on appeal.

The following is a general outline of the facts. The parties were married January 4, 1964. Their marriage was dissolved March 14, 1984. A son was emancipated. Their 16–year–old daughter was placed in the custody of the petitioner and she was awarded $350.00 per month child support.

Before the dissolution, respondent had a used car sales business under the name "Scott Auto Sales." He also had an interest in "Mobile Home Wholesalers." There was evidence respondent for 1982 had an income of $54,400.00 and had an average monthly income of $3,630.55 for the first nine months of 1983. The dissolution court placed "the value of the respondent's businesses at $100,000.00, which may be low, but subject to an indebtedness of $59,-000.00."

The total value of the marital property distributed by the decree was $163,500.00 and the parties' total indebtedness was $80,200.00. This indebtedness included $59,000.00 due a bank, which was the business indebtedness referred to above, secured by two certificates of deposit belonging to petitioner's parents. The total value of those certificates was $60,000.00.

The home of the parties was distributed to the petitioner. The business assets were awarded to the respondent. The indebtedness was assigned so that the net value of the marital assets distributed to the petitioner was $42,300.00. The net value of marital assets distributed to the respondent was $41,000.00. The assignment of indebtedness to the respondent was accomplished by the following:

"The court gives petitioner a judgment against respondent in the sum of $59,-

000.00. This is maintenance in gross and may be satisfied by the respondent either satisfying the obligation to CharterBank in the amount of $59,000.00 or by obtaining the release of petitioner from any obligation she may have on the said $59,-000.00 loan, and also the release of her parents' CD's as security on said loan."

In addition, the decree of dissolution awarded the petitioner periodic maintenance of $250.00 per month.

Petitioner's current Motion for Contempt was filed on November 5, 1986. A hearing was held upon that motion on January 27, 1989. The petitioner testified the respondent was in arrears in the payment of maintenance in gross of $56,653.59, periodic maintenance of $14,705.00 and child support of $4,430.00. Through an officer of the Landmark Bank of Springfield, she introduced a host of records reflecting financial transactions of respondent Jay Scott and Suzanne Scott with that bank. Respondent married Suzanne Jones after March 14, 1984. Those records included account ledgers, signature cards, financial statements, and loan documents.

The financial statements were upon printed forms. The heading of each form stated the name of the credit applicant and opened with the following statement.

"For the purpose of obtaining and maintaining credit from time to time in any form whatsoever with the above named Bank, for claims and demands against the undersigned, the undersigned voluntarily submits the following as being a complete and accurate statement of financial condition...."

The following declaration was found above the signature lines.

"I, the undersigned, hereby solemnly certify and declare that the statements and representations shown on this financial statement constitute a true and accurate account of my financial condition as of the date shown below."

The following is a summary of the contents of nine financial statements.

### Personal Financial Statements

| Date | Net Worth | Typed Name | Signature |
|---|---|---|---|
| 4–15–83 | $181,000.00 | Jay Scott | Jay Scott |
| 8–23–83 | 193,467.00 | Jay Scott | Jay Scott |
| 9–25–84 | 227,100.00 | Jay & Suzanne Scott | Jay & Suzanne Scott |
| 11–22–85 | 241,863.00 | Jay & Suzanne Scott | Jay & Suzanne Scott |
| 11–22–85 | 225,254.00 | Jay & Suzanne Scott | Jay Scott |
| 7–7–86 | 202,000.00 | Jay & Suzanne Scott | Suzanne Scott |
| 9–9–86 | 306,800.00 | Suzanne Scott | Suzanne Scott |
| 2–2–87 | 175,440.00 | Jay & Suzanne Scott | Jay Scott |
| 9–21–88 | 164,500.00 | Suzanne Scott | Suzanne Scott |

Those records also include an account summary pertaining to a note payable to the bank dated September 2, 1983, in the amount of $84,000.00 signed by Jay Scott and Suzanne Jones. It evidenced a floating line of credit and was secured by a deed of trust executed by Suzanne Jones. Respondent was then married to petitioner. He explained, "Like I was saying earlier, I had to sign a piece of paper stating I didn't have no conflict in the piece of property on Roanoke when she borrowed money on it."

Respondent signed the note but not the deed of trust. The printed summary of the use of that line of credit bears only the name of Jay Scott. It reflects that between September 2, 1983 and November 26, 1987, the bank advanced and presumably was repaid a total of $871,150.31.

The respondent admitted he was in arrears in the amounts testified by petitioner. No effort will be made to state in detail respondent's testimony. He attempted to justify his delinquency by testimony that

his businesses were not successful, he spent his assets in the payment of personal bills, and he was unable to find suitable employment. He attributed much of his financial difficulties to a criminal conviction in Texas and federal tax liens filed against him in the amount of $42,149.02.

Respondent's only testimony concerning what happened to the assets distributed to him by the dissolution decree was that it was used to pay bills. The payment of bills did not include his $59,000.00 business debt allocated to him. In regard to that indebtedness, he testified:

"Q. Does not that mean that the two CD's that were pledged at the bank were cashed in by the bank to pay that loan, because you chose to pay other bills?

A. Yes."

After respondent closed Scott Auto Sales and the mobile home business became defunct, respondent was involved in "S & J Motors." He said the business was financed by and owned by his wife Suzanne. He explained:

"A. For a short period of time, I don't know. S and J Motors—I don't know how long it did—See, I didn't own the business, *totally*. I just run it, but I run it for about a year or so, two years, I don't know how long it was." (Emphasis added.)

He was paid no compensation. He also became involved in "Scott Trucking." Again he said this business was owned by Suzanne and he received no compensation. Respondent also testified that for a period of time Suzanne had money invested in "STS Telephone Systems." Respondent explained:

"A. Well, there again, there was some money taken out of S and J Motors and invested in this phone company. And it was—We was supposed to get half of the profit of the phone company for loaning him the money."

The bank account signature card for STS Telephone Systems is headed "Jay Scott or Joe Lundquist" and on the reverse side recites: "Relation of Signers *partners*". Also respondent and Lannis Dunn ran a mobile home service company. Respondent said he received no compensation or profit and the business is defunct. Respondent now occasionally sells a car for a friend. He receives no commission. He said because of his criminal conviction he has been unable to obtain suitable employment.

■ The respondent's first point is the trial court erred

"for the reason that there was no showing made by a preponderance of the evidence that the appellant had an ability to pay the sums required by the court decree or that he intentionally and contumareously [sic] placed himself in a position where he was unable to comply with the terms of the decree because the preponderance of the evidence did show that appellant's limited education, his inability to read, his criminal conviction and the IRS tax liens filed against him were factors beyond his control to remedy and had placed him in a position where his only source of personal funds or income to pay the purge amount established by the court was from the assets of other persons over whom appellant had no control."

This point does not take cognizance of the principles by which the sufficiency of the evidence is to be measured. The respondent may be held in contempt if he "is financially able to make the required payment *or* that he has intentionally and contumaciously placed himself in a position so that he could not comply with the court's orders." *State ex rel. Stanhope v. Pratt*, 533 S.W.2d 567, 575 (Mo. banc 1976). (Emphasis added.) The respondent's "argument ignores that the test for contempt is in the disjunctive". *Johnson v. Johnson*, 722 S.W.2d 136, 138 (Mo.App.1986).

"When a former spouse proves that the other has failed to make required payments under a dissolution, a prima facie case of contempt has been shown. The other party then has the burden of proving inability to make the payments *and* that being in that position did not occur intentionally and contumaciously." *Owsley v. Owsley*, 693 S.W.2d 897, 898 (Mo.App.1985). (Emphasis added.)

It is trite to observe that

"[o]n appeal of a court-tried case, the appellate court defers to the trial court

on factual issues because it is in a better position not only to judge the credibility of witnesses and the persons directly, but also their sincerity and character and other trial intangibles which may not be completely revealed by the record.... As the trier of fact, the trial court has leave to believe or disbelieve all, part or none of the testimony of any witness." *In re Adoption of W.B.L.*, 681 S.W.2d 452, 455 (Mo. banc 1984). (Citations omitted.)

■ The trial court was not required to accept the respondent's generalized justification for his delinquency. His Texas conviction in 1980 did not prevent the respondent from earning $54,400.00 in 1982 and $32,674.95 in the first nine months of 1983. The federal tax liens filed in 1988 could have been no hinderance to respondent's employment or business activity from 1984 to 1988.

The 1984 decree of dissolution reflects business assets, valued at $100,000.00, were distributed to the respondent. He did not pay the business indebtedness assigned to him. Jay Scott's Personal Statement of August 23, 1983, states his net worth is $193,467.00. His listed assets include cash of $86,800.00 and three itemized notes receivable totalling $44,600.00. The Personal Statement of Jay Scott and Suzanne Scott of September 25, 1984, shows their net worth to be $227,100.00. The assets listed include a note that was itemized on the Jay Scott statement. A Security Agreement, dated July 6, 1987, recites "Jay Scott DBA S & J Motors" and is signed by Jay Scott. Respondent testified he signed the $84,-000.00 note of September 2, 1983 before his marriage to Suzanne to provide capital for S & J Motors.

The foregoing are examples of documentary contradiction of respondent's testimony that after the dissolution, he had no financial interest in the various businesses and no assets under his control. His testimony to that effect is replete with self-contradictions and inherently incredible statements. To observe that these contradictions provide a basis for the trial court to find the respondent's explanations and ex-

cuses not credible is an understatement. In summary, the finding of the trial court that the respondent did not carry his burden of proof is not contrary to the evidence. Rather, it is an inference inexorably drawn from competent and substantial evidence. Cf. *McCollum v. McCollum*, 693 S.W.2d 307 (Mo.App.1985); *Johnson v. Johnson, supra; Haley v. Haley*, 648 S.W.2d 890 (Mo.App.1982). The respondent's first point is denied.

■ The respondent's second and final point is that the judgment and commitment are invalid because "the court stated only its conclusions and failed in its judgment and commitment to recite the facts and circumstances constituting the appellant's contempt". He complains of the following language:

> "The Court finds that respondent, although able-bodied and mentally fit for employment, has failed and refused to maintain employment. Respondent has transferred property to his present spouse without consideration. Respondent has performed work and other services in the furtherance of enterprises held only in his spouse's name, for no direct compensation and having at his disposal the assets of those enterprises."

He argues that the trial court was required to recite

> "those portions of the evidence which caused the Trial Court to believe, by a preponderance of the evidence, that Appellant was able-bodied, mentally fit and had (deliberately) failed and refused to be employed; (b) should have recited what property Appellant transferred to his spouse 'without consideration' and when; (c) should have recited what work and services were performed by Appellant for which no direct compensation was received".

He cites the rule that "[i]n a civil contempt case, both the contempt judgment and the order of commitment must set forth the facts and circumstances which constitute the contempt. *Ex parte Ryan*, 607 S.W.2d 888, 891 (Mo.App.1980)." *Roark v. Roark*, 723 S.W.2d 439, 441 (Mo.App.1986).

The cited rule is well-founded and unquestioned. However, the application of that rule is illustrated in *Roark*.

"The judgment of contempt and the commitment order themselves state only conclusions, not facts, and, therefore, are facially insufficient. As in *Hunt*, [*v. Moreland*, 697 S.W.2d 326 (Mo.App. 1984)] they do not state whether husband divested himself of assets, voluntarily left employment, refused to seek employment, or engaged in similar conduct, and whether he did so intentionally for the purpose of frustrating enforcement of the court's order." *Roark* at 441.

The judgment and commitment in this case are subject to none of the infirmities cited in *Roark*. The judgment and commitment do not state evidentiary details but fully state ultimate facts found by the court necessary to support the judgment. Those ultimate facts are comparable to those found in the judgment and commitment approved in Johnson v. Johnson, supra. The respondent's last point has no merit. The judgment of the trial court is affirmed. The cause is remanded to the trial court for the continued exercise of its jurisdiction retained in accordance with the procedure approved in *Johnson*. Also see *McCollum v. McCollum, supra*.

FLANIGAN, P.J., and SHRUM, J., concur.